[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 18, 2002
THOMAS K. KAHN
CLERK

No. 99-14546

D. C. Docket No. 96-00106

LARRY EUGENE MOON,

Petitioner-Appellant,

versus

FREDERICK J. HEAD, Warden,
Georgia Diagnostic and Classification Prison,

Respondent-Appellee.

Appeal from the United States District Court
for the Northern District of Georgia

**(March 18, 2002)**

Before TJOFLAT, CARNES and HULL, Circuit Judges,

TJOFLAT, Circuit Judge:

Petitioner in this case, a Georgia prison inmate, seeks a writ of habeas corpus setting aside his death sentence. The United States District Court for the Northern District of Georgia denied the writ. We affirm.

I.

A.

In March of 1987, Larry Eugene Moon, the petitioner, was indicted in

Catoosa County, Georgia, for the armed robbery and murder of Ricky Callahan.

After pleading not guilty, he went to trial before a jury in the Superior Court of

Catoosa County on January 15, 1988.  According to the Supreme Court of Georgia,

the following facts were established during the guilt phase of the trial:[1]

> At 10:30 p.m. on November 24, 1984, the victim, Ricky Callahan, drove a
> 1978 Ford LTD to a convenience store to purchase headache medicine for
> his wife.  He never returned.  His body was found the next morning in a
> chert pit, shot twice in the head.  Larry Moon left his motel room late in the
> evening of November 24, 1984, for the announced purpose of making a
> telephone call.  He returned later, driving the victim's car.  He removed
> approximately $60 from the victim's wallet, and discarded the wallet.  Moon
> and his companion then drove to Chattanooga, Tennessee, where she left
> him.  On November 26, 1984, a 1980 Buick Riviera was stolen from the
> parking lot of a shopping mall in Decatur, Alabama. The Callahan car was
> discovered abandoned three miles west of Decatur, Alabama, on November
> 28, 1984.  On December 14, 1984, a 1982 Buick LeSabre was stolen from a
> parking lot in Oneida, Tennessee. The local police knew the owner and the
> car, and it was soon spotted in Oneida. After a high-speed chase through the
> surrounding countryside, the police apprehended the car and its driver, Larry
> Moon. A number of guns were recovered from the interior of the stolen
> automobile, including one later identified as the murder weapon in this case.

---

[1] 28 U.S.C. § 2254(e)(1) states, "In a proceeding instituted by an application for a writ of
habeas corpus by a person in custody pursuant to the judgment of a State court, a determination
of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have
the burden of rebutting the presumption of correctness by clear and convincing evidence."
Accordingly, we adopt the findings of fact made by the Georgia Supreme Court in reviewing
Moon's convictions and death sentence and summarize them herein.

Soon after Moon's capture, the police recovered from another parking lot in Oneida the 1980 Buick Riviera that had been stolen in Decatur, Alabama. The keys to this car were found on Moon when he was arrested. Inside this car were cassette tapes that had been inside Callahan's Ford LTD before it was stolen.

Moon v. State, 375 S.E.2d 442, 445 (Ga. 1988), *cert. denied*, 499 U.S. 982 (1991).

The jury found Moon guilty as charged, and, after a brief recess, the sentencing phase of the trial (on the murder count) began. The prosecution produced further information about Moon's activities both before and after Callahan's killing. Evidence was presented that on November 15, 1984, Moon shot and killed Jimmy Hutcheson at Brown's Tavern in Chattanooga, Tennessee. Ronald Wilbanks, a friend of both Moon and Hutcheson, testified that Moon had confessed to him that he killed Hutcheson, telling Wilbanks that he (Moon) had "sent a guy in [the tavern] to get Jimmy Hutcheson to tell him to come outside, somebody wanted to talk to him, and that's when [Moon] shot him."[2] Shortly after this killing Moon traveled to Catoosa County, Georgia, where the Callahan homicide occurred. About one week later, on December 1, Moon returned to Chattanooga and, at 3:00 a.m., robbed at gunpoint Peeper's Adult Bookstore. Upon leaving the store, Moon kidnapped Terry Lee Elkins, who was using the

---

[2] Wilbanks also testified that when Moon confessed to him, Moon had in his possession a .30 caliber carbine. Ed Foster, the Tennessee investigator in charge of the Hutcheson murder, later testified at the sentencing phase that he recovered ten empty .30 caliber carbine cartridges from the parking lot where Hutcheson's body lay.

telephone at the store and was dressed as a female impersonator. Moon drove Elkins back to Georgia, where he stopped the car and sodomized his captive by the side of the road, threatening to kill him if he refused to submit.

Moon then returned Elkins to Chattanooga and, still using the Buick Riviera he had stolen in Alabama, drove to Gatlinburg, Tennessee. A few minutes after midnight the next day, December 2, as he was driving through Gatlinburg, he encountered Thomas DeJose and his fiancée, Darryl Ehrlanger. Ehrlanger, who was employed at a Gatlinburg restaurant, had just gotten off work and met DeJose, who had been at a bar. The couple stood on a street corner, debating how they would get home, which was several miles outside of Gatlinburg, near Cosby. About that time Moon pulled the car up alongside the couple and, according to Ehrlanger, offered them a ride. DeJose got in the front passenger's seat; Ehrlanger sat in the back seat, directly behind him.

Ehrlanger testified that after turning into the private, dirt road that led to their residence, Moon stopped the car and got out. When DeJose got out of the car to check on Moon, Moon pushed DeJose. Moon then reached in and grabbed Ehrlanger, still in the back seat, pulled her out of the seat, and retrieved a rifle from the back, driver's-side floorboard. Ehrlanger testified that Moon "shot the gun up in the air," while DeJose ran around to the driver's side to reach across the front

4

seat and try to pull Ehrlanger back into the car.  Ehrlanger, still on the passenger's side of the car with Moon, began to fight him.  With a gun to Ehrlanger's head, Moon told DeJose to get out of the car, or he would "blow her [Ehrlanger] away." DeJose got out and walked to the back of the car, where, according to Ehrlanger, Moon shot him in the chest.  Ehrlanger started toward DeJose, but he ordered her to run away.  As she ran down the road and into the woods, Ehrlanger heard the firing of shots.  After Moon had driven away, Ehrlanger returned to where DeJose lay, but he was already dead.

The State also put on as a witness David Davenport, an investigator for the Tennessee Bureau of Investigation ("TBI") and the case agent for the DeJose killing.  Davenport's testimony established that DeJose had been shot four times in the head and chest by a .22 pistol and a rifle.  After Moon was eventually arrested, Davenport testified, he took possession of the stolen Buick Riviera that Moon had been driving at the time of DeJose's killing.  According to Davenport, the Buick's front-seat headrest was stained with blood, which, based on TBI lab results, were consistent with the blood of DeJose.  Davenport also acknowledged in his testimony that a knife had been found among DeJose's personal effects.

Further evidence was presented at the sentencing hearing that on December 7, about five days after the DeJose killing, Moon was again in Chattanooga.  On

5

that day, he robbed a convenience store owned by Ray York. Moon took over $900 from the store as well as York's billfold and .357 magnum pistol. This pistol was recovered from the stolen car Moon was driving, the 1982 Buick LeSabre, when he was arrested the following week, on December 14.

The sentencing phase of the trial took three days. After deliberating for three hours and three minutes, the jury returned a verdict calling for the death penalty.

B.

On January 21, 1988, the superior court sentenced Moon to death for the murder of Ricky Callahan. Moon appealed, and, on November 30, 1988, the Georgia Supreme Court affirmed his convictions and death sentence. See Moon v. State, 375 S.E.2d 442 (Ga. 1988). On April 22, 1991, the United States Supreme Court denied his petition for a writ of certiorari. Moon v. Georgia, 499 U.S. 982, 111 S. Ct. 1638, 113 L. Ed. 2d 733 (1991), *reh'g denied by* 501 U.S. 1224 (1991).

Moon then turned to the Superior Court of Butts County, Georgia, (the "state habeas court") for relief, filing a petition for a writ of habeas corpus. His petition contained fifty-one claims; some addressed his convictions, some his death sentence. The court held an evidentiary hearing on March 15, 1993, and in an order dated July 30, 1993, found three of Moon's claims meritorious and granted

6

the writ, setting aside his convictions (and therefore his sentences).[3] In its order, the court reserved ruling on the remaining forty-eight claims in Moon's petition. The State appealed the superior court's decision to the Georgia Supreme Court. On February 28, 1994, the supreme court reversed, finding no merit in the grounds relied on by the superior court in granting the writ, and remanded the case for a decision on Moon's remaining claims. Zant v. Moon, 440 S.E.2d 657 (Ga. 1994). Moon immediately petitioned the United States Supreme Court for a writ of certiorari. The Court denied his petition on October 31, 1994. Moon v. Zant, 513 U.S. 968, 115 S. Ct. 437, 130 L. Ed. 2d 348 (1994), *reh'g denied by* 513 U.S. 1104 (1995). The superior court, on remand, subsequently denied Moon's remaining claims on April 5, 1995. It denied his motion for reconsideration on October 20, 1995.

On April 22, 1996, Moon filed the petition for writ of habeas corpus now before us. His petition contained thirty-three claims. The district court conducted an evidentiary hearing on February 23, 1999, and on August 2, 1999, denied relief. Moon then sought a Certificate of Probable Cause ("CPC") to appeal the court's

---

[3] Specifically, the state habeas court granted relief "because of (1) the errors committed during the testimony of the DeJose incident introduced during the sentencing phase of the trial, (2) the incomplete evaluation of petitioner's mental condition and the resulting lack of appropriate mitigation evidence during the sentencing phase of the trial, and (3) the state's improper use of a peremptory strike to remove the sole black member of the petit jury panel."

judgment.[4]  On January 27, 2000, the district court granted Moon a Certificate of

Appealability ("COA") with respect to four claims.[5]  Moon then filed an

unopposed motion to convert the COA to a CPC and to expand the issues on

appeal.  We granted his motion on February 23, 2000.

On April 26, 2000, however, the United States Supreme Court ruled that the

Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which

amended 28 U.S.C. § 2253, applies to all appeals initiated after AEDPA's effective

date, April 24, 1996.  See Slack v. McDaniel, 529 U.S. 473, 478, 120 S. Ct. 1595,

1600, 146 L. Ed. 2d 542 (2000).  Thus, the proper ruling on Moon's request for

appeal, initiated on November 5, 1999, was a COA.  We therefore converted our

---

[4] At the time Moon sought leave to appeal, it was proper procedure in this circuit to apply the CPC rules developed under the old version of 28 U.S.C. § 2253 to habeas petitions filed in federal court before the April 24, 1996 effective date of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA").  This was true regardless of the date on which the appeal was sought.  See Tompkins v. Moore, 193 F.3d 1327, 1330 (11th Cir. 1999).

[5] According to the AEDPA amendments to 28 U.S.C. § 2253, a Certificate of Appeability ("COA") must "indicate which specific issue or issues" show that the applicant has suffered "the denial of a constitutional right."  28 U.S.C. § 2253(c)(2)-(3); Franklin v. Hightower, 215 F.3d 1196, 1199 (11th Cir. 2000).  The four claims the district court included in Moon's COA were (1) that the state violated Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), when it used one of its peremptory strikes to remove the only black person on the jury panel, (2) that Moon's trial attorney rendered ineffective assistance of counsel by failing to investigate mitigating evidence, (3) that Moon's constitutional rights were violated during the sentencing phase when the trial court ordered that he be shackled, and (4) that Moon's constitutional rights and rights under the Interstate Act on Detainers were violated when he was extradited to Georgia under the Uniform Criminal Extradition Act, O.C.G.A. § 17-13-24, even though the state of Georgia had already filed a detainer on him.

earlier order granting a CPC into an order granting a COA and specified as appealable the seven claims[6] Moon had presented to this court in his initial brief.

## II.

## A.

Moon grounds four of his claims in evidence made available to him post trial regarding the killing of Thomas DeJose. In particular, Moon learned that one of the State's witnesses at the sentencing phase, David Davenport of the Tennessee Bureau of Investigation ("TBI"), had failed to reveal certain key pieces of information about the killing. First, Davenport failed to disclose that the TBI had run a criminal background check on DeJose, which revealed that he had served twenty-nine months in prison for an armed robbery conviction and had fled New York to avoid beginning a six-month sentence on a DUI conviction. In addition, Davenport failed to make known that DeJose's blood alcohol level was .17 at the time of his death and that his autopsy showed signs of recent drug use. Finally, Davenport failed to divulge that Darryl Ehrlanger, DeJose's girlfriend and the other witness testifying about the killing, had failed a TBI lie detector test.

---

[6] In his initial brief to this court, Moon presented six grounds for relief, but, for clarity, we will treat them as seven distinct claims.

Armed with this new information, Moon sets out his claims.  First, he contends that the State violated <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), by withholding the suppressed evidence.  Second, and more accurately characterized as an alternative argument, Moon asserts that his counsel was ineffective for failing to discover and offer the DeJose evidence at the sentencing phase of the trial.  Third, Moon contends that by presenting Ehrlanger's testimony, which, he claims, the state habeas court found to be false, the State violated <u>Giglio v. United States</u>, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972).  Finally, Moon submits that even if we find no misconduct on the part of the Georgia prosecutor, Ehrlanger's and Davenport's testimonies were so unreliable that their use as a basis for his sentence violated his Eighth and Fourteenth Amendment rights.  We discuss each claim in turn.

1.

Moon contends that the State violated <u>Brady</u> by failing to disclose the favorable evidence in its possession involving the death of Thomas DeJose.  Had he timely received this evidence, Moon claims, there is a reasonable probability that the outcome of the sentencing phase would have been different.

The Supreme Court in <u>Brady</u> held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the

10

evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87, 83 S. Ct. at 1196-97. In order to establish a Brady violation, Moon must prove: "(1) that the [G]overnment possessed evidence favorable to the defense, (2) that the defendant did not possess the evidence and could not obtain it with any reasonable diligence, (3) that the prosecution suppressed the evidence, and (4) that a reasonable probability exists that the outcome of the proceeding would have been different had the evidence been disclosed to the defense." Spivey v. Head, 207 F.3d 1263, 1283 (11th Cir. 2000) (citations omitted), *cert. denied by* 531 U.S. 1053, 121 S. Ct. 660, 148 L. Ed. 2d 562 (2000).

To fulfill the first prong of this test – that the Government "possessed" the favorable information – Moon essentially makes two arguments. First, he asserts that the Georgia prosecution team actually had the information because Davenport, the TBI investigator, testified that he "turned over his entire investigative file" to the Georgia prosecutor. Because the state habeas court found that the TBI possessed this information, Moon continues, then Davenport's turning over his file necessarily means that the Georgia prosecutor possessed the evidence. Alternatively, Moon argues that even if the Georgia prosecutor did not actually possess the information, the prosecutor constructively possessed it because

11

Davenport "act[ed] on the government's behalf," and, therefore, evidence known to Davenport was in the "possession" of the Georgia prosecution team.

We find that Moon's first argument is unsupported by the record. Although the state habeas court implicitly found that the TBI possessed the favorable evidence, the Georgia Supreme Court explicitly held that Moon "failed to prove that the information was in the hands of the [Georgia] prosecutors." Zant v. Moon, 440 S.E.2d 657, 664 (Ga. 1994). Moon responds with a citation to Davenport's deposition, given in the federal district court (prior to that court's disposition of the instant habeas petition) four years after the Georgia court's decision, and argues that Davenport admits handing over his entire file, including the favorable information. The record more accurately reflects, however, that Davenport "didn't know" what exactly he had done with his file and the information regarding DeJose. Indeed, he gave his deposition testimony over ten years after his interactions, if any, with the Georgia prosecutor. At one point, Davenport testified that he was "sure [the Georgia prosecutor] had what I knew, a knowledge of what I knew, because he had been in contact with [the other Tennessee detective]." Yet, when pressed about whether he actually made his file available to the Georgia prosecutor, Davenport responded,

> I assume I did. I don't know . . . I have an open file and I try to copy everything, you know, to [the prosecution]. But in this case, I don't know if

12

[the Georgia prosecutor] had it. I don't know. I can't remember. But that's my practice.

We conclude that Davenport's uncertainty about what he did with the favorable information is insufficient to establish conclusively that the Georgia prosecutor possessed the favorable evidence.

We are likewise unconvinced by Moon's alternative argument that the possession of the favorable evidence by Davenport, presumably an extension of the Georgia prosecution team, by itself fulfills the first prong of our <u>Brady</u> test. For this proposition, Moon cites <u>Kyles v. Whitley</u>, 514 U.S. 419, 437, 115 S. Ct. 1555, 1567, 131 L. Ed. 2d 490 (1995), which states that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." <u>Kyles</u> does not, however, further define what exactly is meant by "acting on the government's behalf." We have held that a claimant must show that the favorable evidence was possessed by "a district's prosecution team, which includes both investigative and prosecutorial personnel." <u>United States v. Meros</u>, 866 F.2d 1304, 1309 (11th Cir. 1989) (citations omitted), *cert. denied by* 493 U.S. 932, 110 S. Ct. 322, 107 L. Ed. 2d 312 (1989). We have further defined a "prosecution team" as "the prosecutor or anyone over whom he has authority." <u>Id.</u> Thus, in <u>Meros</u>, we held that a prosecutor in the Middle District of Florida did not "possess" favorable

13

information known by prosecutors in the Northern District of Georgia and the Eastern District of Pennsylvania. Id. Indeed, we stated that "[a] prosecutor has no duty to undertake a fishing expedition in other jurisdictions in an effort to find potentially impeaching evidence every time a criminal defendant makes a Brady request for information regarding a government witness." Id.

This court's predecessor, the Fifth Circuit, held that there was no per se rule to determine whether information possessed by one government entity should be imputed to another, but rather, required "a case-by-case analysis of the extent of interaction and cooperation between the two governments." United States v. Antone, 603 F.2d 566, 570 (5th Cir. 1979).[7] In Antone, the court found that information possessed by state investigators should be imputed to the federal prosecutor only because "the two governments, state and federal, pooled their investigative energies [to prosecute the defendants]." Id. at 569. There, a joint investigative task force composed of FBI agents and state investigators was formed to solve the murder of a state police officer. See id. at 568. Joint meetings were held, tasks were divided, and state officers were "important witnesses in the federal

---

[7] The question confronting the court in Antone was whether the prosecutor violated Giglio v. United States, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972), by offering into evidence false testimony. See Antone, 603 F.2d at 569. We find the case instructive, nevertheless, because the standard for determining whether the prosecution had knowledge of the testimony's falsity is the same one used to decide whether a prosecutor possessed favorable information to make out a claim under Brady. See id.

prosecution." Id. at 569. Thus, the court found that the state investigators essentially "functioned as agents of the federal government under the principles of agency law." Id. at 570.

Other courts have held that one governmental entity's possession of favorable information should not necessarily be imputed to another. See, e.g., United States v. Avellino, 136 F.3d 249, 255 (2d Cir. 1998) ("[K]nowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutor, for the imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require us to adopt a monolithic view of government that would condemn the prosecution of criminal cases to a state of paralysis.") (citations omitted); United States v. Locascio, 6 F.3d 924, 949 (2d Cir. 1993) ("We will not infer the prosecutors' knowledge simply because some other government agents knew about the report."); Johnston v. Love, 940 F. Supp. 738, 768-71 (E.D. Penn. 1996) (declining to impute to the state attorney the federal prosecutor's knowledge of a witness immunity agreement because the federal prosecutor was not an agent for the State, did not consult or obtain the consent of the State, and did not bind the State when he entered into the immunity agreement with the witness).

15

We therefore refuse to impute to the Georgia prosecutor the evidence regarding DeJose possessed by Davenport and the TBI. As the Georgia Supreme Court held, we find "no evidence that Tennessee law enforcement officials and Georgia prosecutors engaged in a joint investigation of the DeJose incident." See Zant v. Moon, 440 S.E.2d 657, 664 (Ga. 1994). Unlike the joint task force in Antone, the Georgia and Tennessee agencies shared no resources or labor; they did not work together to investigate the DeJose or Callahan murders. Nor is there evidence that anyone at the TBI was acting as an agent of the Georgia prosecutor. Davenport was not under the direction or supervision of the Georgia officials, and, had he chosen to do so, could have refused to share any information with the Georgia prosecutor.[8] At most, the Georgia prosecutor utilized Davenport as a witness to provide background information to the Georgia courts. This is insufficient to establish Davenport as part of the Georgia "prosecution team."

Assuming for the sake of argument, however, that the Georgia prosecutor "possessed" the DeJose information – and the first prong of our Brady analysis is fulfilled – we conclude that Moon fails to overcome the standard of materiality established by the Supreme Court. That is to say, even if the Georgia prosecutor

_____

[8] We again note that it is unclear from the record whether Davenport indeed refused to share his information. He repeatedly testified in his deposition at the federal evidentiary hearing that he "didn't know" what exactly he did with the DeJose information.

16

"possessed" the information, he was under no duty under <u>Brady</u> to reveal it.  The

Supreme Court has held that "the Constitution is not violated every time the

government fails or chooses not to disclose evidence that might prove helpful to

the defense."  <u>Kyles</u>, 514 U.S. at 436-37, 115 S. Ct. at 1567.

For Moon to succeed on his <u>Brady</u> claim, he must demonstrate a "reasonable

probability" that, had the favorable evidence regarding DeJose been disclosed to his

counsel, "the result of the proceeding would have been different."  <u>United States v.</u>

<u>Bagley</u>, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383, 87 L. Ed. 2d 481 (1985).  The

issue on review is not whether Moon would "more likely than not have received a

different verdict with the evidence, but whether in its absence he received a fair

trial" – one "resulting in a verdict worthy of confidence."  <u>Kyles</u>, 514 U.S. at 434,

115 S. Ct. at 1566.  Thus, Moon need not surpass a sufficiency of evidence test; he

"need not demonstrate that after discounting the inculpatory evidence in light of the

undisclosed evidence, there would not have been enough left to convict."  <u>Id.</u> at

434-35, 115 S. Ct. at 1566.  Moon need only show that the favorable DeJose

evidence "could reasonably be taken to put the whole case in such a different light

as to undermine confidence in the [outcome]."  <u>Id.</u> at 435, 115 S. Ct. at 1566.  We

review *de novo* the district court's determination of this issue.  <u>See United States v.</u>

<u>Scheer</u>, 168 F.3d 445, 452 (11th Cir. 1999).

Essentially, Moon argues that the suppressed evidence would have discredited Ehrlanger and Davenport as witnesses and would have helped establish a defense of justification – that DeJose sought to rob Moon with a knife and caused him to shoot DeJose in self-defense.[9]   Unfortunately, Moon does not explain how exactly the suppressed evidence would have been admitted or used in order to accomplish the tasks he imagines.  We therefore must do so ourselves, and, in so doing, we keep in mind that both Moon – in statements he made to the Tennessee authorities – and Davenport – in his testimony at the sentencing phase – agree that Moon fired four shots into the victim.  The only difference in the two versions is that Moon claimed DeJose first pulled out a knife and demanded money, whereas Ehrlanger contended that Moon was the initial aggressor.

---

[9] During the sentencing phase of his trial, Moon presented no evidence to contradict Ehrlanger's testimony concerning the DeJose killing.  Had he possessed the evidence Davenport allegedly withheld, Moon posits that he could have shown that he shot DeJose in self-defense.  Moon's theory of self-defense is not a new one, however.  In statements made to Tennessee investigators a few days after the incident – to Davenport, who was investigating the DeJose homicide, and to Detective Ed Foster, who was investigating the Hutcheson homicide – Moon claimed that he shot DeJose because he "pulled a knife on me and told me that he wanted money."  These statements were admitted into evidence by the defense during a hearing outside of the jury's presence on a motion to suppress by Moon.  In that motion, Moon contended that sometime after being advised of his Miranda rights, he had clearly invoked his right to remain silent and that his statements, which were incriminatory, were inadmissible.  The trial court disagreed and denied Moon's motion to suppress.  Although the statements were admissible, the prosecutor, for reasons not disclosed by the record, chose not to introduce them through Davenport's testimony.  Nonetheless, Moon's counsel possessed the statements and, thus, were well aware at the time of the trial that Moon was insisting that he killed DeJose in self-defense.

Regarding DeJose's prior conviction of armed robbery, we cannot conceive of any scenario in which it would have helped Moon. Under Georgia law in 1988, DeJose's prior conviction, standing alone, would have been inadmissible; rather, Moon would have had to present testimony of DeJose's "general reputation for violence." Bennett v. State, 326 S.E.2d 438, 440 (Ga. 1985). Before Moon could have put on a reputation witness, however, he would have had to take the stand and present a prima facie case of self-defense. See Henderson v. State, 218 S.E.2d 612, 614 (Ga. 1975). In doing so, Moon's statements to the Tennessee authorities invariably would have been admitted – on cross examination, or if denied, on rebuttal. In those statements, Moon explained that he shot DeJose in the head with a .22 caliber pistol and that DeJose then got in the driver's seat of Moon's (stolen) car, thereby abandoning his attack on Moon. Nonetheless, Moon confesses, he then fired three more shots into DeJose – with the pistol and with a .30 caliber rifle – before DeJose finally fell dead.[10] We cannot imagine any way that this information – even preceded with evidence that DeJose had a "reputation for violence" – could have possibly bolstered Moon's self-defense story.

---

[10] Moon fired these shots after Ehrlanger had fled into the woods and, according to her testimony, had fired several shots at her.

Similarly, none of the other evidence prosecutors allegedly withheld provides much support for Moon's defense. We can discern no beneficial use for the information that DeJose had fled New York to avoid serving a six-month sentence. Presumably, this evidence would have been admitted to establish DeJose's motive to rob Moon. We believe, however, that this evidence could have been interpreted by a reasonably-minded jury to mean just the opposite: that DeJose was hiding out and would have wanted to avoid being sought by law enforcement. Moreover, that DeJose died with a blood alcohol content of .17 is insignificant in light of Ehrlanger's admission to the jury that DeJose had been at a bar and had consumed "two, three beers." Indeed, this piece of evidence could reasonably have been viewed by the jury the other way – that Moon was unjustified in firing four shots into a drunk victim who had nothing but a knife. DeJose's autopsy report that there were signs of recent drug use also adds nothing to Moon's case: Linking this information to the ultimate fact that, after Moon entered the driveway leading to DeJose and Ehrlanger's house, DeJose attempted to rob Moon with a knife in order to sustain a drug habit would be too tenuous

Finally, Ehrlanger's lie detector results would have been useless for purposes of impeaching her. Under Georgia law, then and now, the results would have been

inadmissible absent an agreement by the parties.[11]  See State v. Chambers, 239

S.E.2d 324, 325 (Ga. 1977).  Accordingly, such evidence is immaterial.  See Wood

v. Bartholomew, 516 U.S. 1, 8, 116 S. Ct. 7, 11, 133 L. Ed. 2d 1 (1995) ("[I]t is not

'reasonably likely' that disclosure of the polygraph results – inadmissible under

state law – would have resulted in a different outcome at trial.").[12]

We are therefore not persuaded by Moon's claim that, armed with the new

evidence, he could have effectively impeached Ehrlanger and Davenport and

established his theory of self-defense.

---

[11] Even if the polygraph results were admissible, we find that they would have done little, if anything, to discredit Ehrlanger's testimony.  The only evidence in the record regarding the polygraph test is an affidavit by the administrator, Ray Pressnell.  According to the affidavit, Ehrlanger's responses to the question, "Have you told the boys all you know about Tommy [DeJose's] death" indicated deception.  The affidavit goes on, however, to state that Ehrlanger attempted to explain the deception (1) by "stating that she thought the subject was at Shoney's Restaurant before she got off work and had followed her to meet Tommy," an answer which would have provided more information to the question "Have you met the person that shot Tommy before the night he was shot?"; and (2) by adding that Tommy "had dropped a cigarette inside the subject's car just a few seconds before he was shot."  According to the affidavit, Ehrlanger presumably did not show responses indicating deception after answering the questions, "Have you intentionally lied to the boys concerning Tommy's death?" and "Are you withholding any information about the night Tommy was shot?".  We believe, therefore, that the polygraph results – if they were admissible – would have been useless in showing that Ehrlanger had lied about the killing.

[12] We are even more assured that the suppressed evidence would have failed to impeach Ehrlanger's and Davenport's testimonies when we consider the evidence about Moon's self-defense theory that the jury already had before it (and presumably rejected).  First, Davenport testified at the sentencing hearing that a knife was found among DeJose's personal effects.  He further testified that blood stains found inside Moon's car were consistent with DeJose's blood, a fact which would have indirectly contradicted Ehrlanger's testimony that once DeJose had been shot, all the activity occurred outside the car.  Finally, as already stated, the jury was well aware that DeJose had been drinking the night of the shooting, as Ehrlanger admitted that DeJose had been at a bar and had likely consumed "two, three beers."

21

Even assuming, however, that the evidence would have accomplished the goals Moon now imagines, the rest of the aggravating evidence introduced at the hearing was so overwhelming that there is no reasonable probability that Moon's sentence would have been different. Ehrlanger and Davenport testified about only one of numerous incidents of crime and violence Moon committed during the one month surrounding Callahan's murder. The jury had already found Moon guilty of the murder and armed robbery of Ricky Callahan. In addition, the jury heard evidence that two weeks before Callahan's murder, Moon shot and killed Jimmy Hutcheson as he left a tavern in Tennessee. The State also submitted evidence that, after the death of Callahan and just one day before DeJose's killing, Moon robbed the Peeper's Adult Bookstore at gunpoint, kidnapped Terry Elkins, took Elkins to Georgia and sodomized him, threatening to kill him if he refused to submit. Moreover, evidence showed that less than a week after the DeJose incident, Moon robbed a convenience store at gunpoint and took over $900 and the owner's .357 magnum handgun. Finally, the jury had been presented with four of Moon's prior convictions, all of which involved burglaries, dating back to 1962 and 1966.[13]

---

[13] The State also introduced eight other convictions, which were later voided in a post-conviction attack in Tennessee because they violated Boykin v. Alabama, 395 U.S. 238, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969). We will discuss Moon's claim regarding these convictions in part II.B.

We therefore find unbelievable Moon's claim that the suppressed evidence would have impeached Davenport and Ehrlanger, rendering impotent the "State's most damaging aggravation witness[es]," and thereby casting doubt on Moon's death sentence. Moreover, even if the evidence had impeached Davenport and Ehrlanger, the sum of aggravating evidence is too substantial to question his sentence. Accordingly, we hold that there is no reasonable probability that Moon's sentence would have been different had his counsel possessed the DeJose evidence prior to trial.

## 2.

Alternatively, Moon argues that his trial counsel were ineffective for failing to discover the favorable evidence regarding DeJose's killing and for failing properly to present it to the jury at the sentencing phase of the trial. Specifically, Moon contends that his counsel rendered a deficient performance because they failed to discover DeJose's criminal record and autopsy report and failed to offer the "physical evidence found at the crime scene" that supported Moon's story of self-defense. Again, he argues that armed with this evidence, his counsel could

23

have "completely eliminated or neutralized" Ehrlanger's testimony, which ultimately "put [him] on death row."[14]

We, like the Georgia Supreme Court and the district court, disagree. In order to succeed on a claim of ineffective assistance of counsel, Moon must first show that his counsel's performance was so deficient that they were "not functioning as the 'counsel' guaranteed by the Sixth Amendment." Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984).[15] Moon must then demonstrate that the deficient performance prejudiced the defense. Id. It is not enough for Moon to prove that "the errors had some conceivable effect on the outcome of the proceeding." Id. at 693, 104 S. Ct. at 2067. Instead, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . .

---

[14] Moon also claims that his counsel were ineffective for failing properly to investigate his background and life history and for failing to present it as mitigating evidence at the sentencing phase. Moreover, Moon asserts that had this information been presented, a mental health expert could have concluded that Moon suffered from organic brain damage, an even more compelling piece of mitigating evidence. We agree with both the Georgia Supreme Court and the district court's finding that "[t]he psychological background information produced by Petitioner's counsel does not paint an entirely sympathetic picture of Moon. His psychological problems could persuade a jury that he was even more dangerous than the ordinary criminal." Zant v. Moon, 440 S.E.2d 657, 662 (Ga. 1994). We therefore reject this claim without further discussion.

[15] The Sixth Amendment is made applicable to the states under the Due Process Clause of the Fourteenth Amendment. See Powell v. Alabama, 287 U.S. 45, 65, 66, 53 S. Ct. 55, 77 L. Ed. 158 (1932). For convenience, we refer to Moon's ineffective assistance claim as a Sixth Amendment claim.

would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id. at 695, 105 S. Ct. at 2069.

In this case, we need not decide whether defense counsel's performance was in fact deficient because Moon so clearly fails to satisfy the prejudice prong of the Sixth Amendment analysis. See Strickland, 466 U.S. at 697, 104 S. Ct. at 2069 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."); see also Grayson v. Thompson, 257 F.3d 1194, 1225 (11th Cir. 2001) (citations omitted). Therefore, even assuming that defense counsel's performance was deficient, we conclude that there is no reasonable probability that the balance of aggravating and mitigating evidence that led to the imposition of the death penalty would have been different had counsel investigated and presented the evidence regarding DeJose's killing.

The evidence upon which Moon bases his Sixth Amendment claim is the same evidence we discussed with regard to his Brady claim in Part II.A.1. For the reasons we have already stated there, we do not believe that the suppressed evidence would have impeached or discredited Ehrlanger's or Davenport's testimonies. Further, even assuming that the evidence could effectively discredit their testimonies, we conclude that the scale is so heavily weighted with

25

aggravating evidence that there is no reasonable probability that Moon's sentence would have been different.

3.

Third, Moon contends that by presenting Ehrlanger's testimony,[16] which he claims is false, the State violated Giglio v. United States, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972). In Giglio, the Supreme Court held that the "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'" Id. at 153, 92 S. Ct. at 766. To prevail on a Giglio claim, Moon must show that the prosecutor "knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony," United States v. Alzate, 47 F.3d 1103, 1110 (11th Cir. 1995), and that the falsehood was material. United States v. Agurs, 427 U.S. 97, 103-04, 96 S. Ct. 2392, 2397, 49 L. Ed. 2d 342 (1976).

Moon argues that the issue of whether Ehrlanger's testimony is false is "not before this court" because the state habeas court found that it was false and the Georgia Supreme Court affirmed. We disagree. The state habeas court, in discussing Moon's Brady claim, observed that "[Moon]'s new counsel have

---

[16] Initially, Moon claimed that both Erhlanger's and Davenport's testimonies were false and violated Giglio. At oral argument, however, when asked directly, Moon's counsel confined his claim to Ehrlanger's testimony.

26

developed substantial evidence that much if not most of Ms. Ehrlanger's testimony is false." This is hardly a factual finding by the state court that Ehrlanger testified falsely; rather, it is merely a characterization of the evidence Moon's counsel had recently discovered. Even assuming that the state court made such a finding, however, the Georgia Supreme Court never affirmed it. In its opinion reversing the state habeas court, the Georgia Supreme Court simply reasserted the lower court's characterization of the new evidence: "In its order granting relief to Petitioner, the habeas court noted that Moon's new counsel had uncovered substantial evidence that Ehrlanger had lied . . .."

Moreover, Moon has done nothing to show that Ehrlanger's testimony was in fact false. Of all the new evidence Moon has cited, none conclusively establishes that Ehrlanger testified falsely at the sentencing phase. DeJose's criminal background, blood alcohol content at death, and history of drug abuse for example, do not directly contradict anything to which Ehrlanger testified. As we have already discussed, *see infra* footnote 11, the results of Ehrlanger's polygraph likewise do not prove that she testified falsely at the sentencing phase. When asked to explain why she showed deception when responding to the question, "Have you told the boys all you know about Tommy [DeJose's] death," Ehrlanger did so, clarifying that maybe she had seen Moon earlier in the evening, and adding

27

information that she had left out in an earlier version. At best, the new evidence about DeJose helps support Moon's theory of self-defense, but it fails to establish that Ehrlanger testified falsely. Accordingly, we deny Moon's Giglio claim.[17]

B.

[17] In addition, Moon argues that even if we find no misconduct on the part of the Georgia prosecutor, Ehrlanger's and Davenport's testimonies were so unreliable that their use as a basis for his sentence violates his Eighth Amendment rights, as made applicable to him by the Fourteenth Amendment. The district court refused to hear the claim, finding that Moon failed to exhaust his state remedies, as required by 28 U.S.C. § 2254(c). Specifically, the court held that Moon "did not allege in his appeal to the Georgia Supreme Court that he was sentenced to death based on false and materially inaccurate information," and "[b]ecause the time in which to file an appeal . . . has run, [Moon's claim] has procedurally defaulted." The court made this finding even though the State never argued to the district court that Moon had defaulted. In its brief to this court, the State again failed to raise procedural default as a reason to deny this claim, thereby waiving the argument. See Gray v. Netherland, 518 U.S. 152, 165-66, 116 S. Ct. 2074, 2082, 135 L. Ed. 2d 457 (1996) ("[B]ecause procedural default is an affirmative defense for the [State] . . . the [State] would have been obligated to raise procedural default as a defense, or lose the right to assert the defense thereafter."); see also Romine v. Head, 253 F.3d 1349, 1363-64 & 1365 n.15 (11th Cir. 2001).

Notwithstanding the State's inability to raise the claim, we have held that a "district court may invoke the [procedural default] bar *sua sponte* [only] where . . . requiring the petitioner to return to state court to exhaust his claims serves an important federal interest." Esslinger v. Davis, 44 F.3d 1515, 1524 (11th Cir. 1995). "If, for example, the case presents an issue on which an unresolved question of fact or of state law might have an important bearing, both comity and judicial efficiency may make it appropriate for the [district] court to insist on complete exhaustion to make sure that it may ultimately review the issue on a fully informed basis." Granberry v. Greer 481 U.S. 129, 134-35, 107 S. Ct. 1671, 1675-76, 95 L. Ed. 2d 119 (1987). We cannot discern – nor did the district court find – any important federal interest in this case to justify raising the bar *sua sponte*. We therefore consider the merits.

To succeed on his claim, Moon must show "that the challenged evidence is materially false or unreliable and . . . that it actually served as the basis for the sentence." See United States v. Reme, 738 F.2d 1156, 1167 (11th Cir. 1984). For the reasons we stated in denying his Giglio claim, we conclude that Moon has failed to show that either Ehrlanger's or Davenport's testimonies is false or unreliable, and, therefore, this claim is without merit.

Moon further claims that the use of subsequently vacated convictions at his sentencing hearing violated the Eighth and Fourteenth Amendments, as interpreted by the Supreme Court in Johnson v. Mississippi, 486 U.S. 578, 108 S. Ct. 1981, 100 L. Ed. 2d 575 (1988). In Johnson, the Supreme Court held that the Mississippi Supreme Court had erred in upholding the sentence of a defendant convicted of murder and sentenced to death where the sentence was based on three aggravating factors, one of which was a felony conviction that was later vacated. Id. at 590, 108 S. Ct. at 1988-89. Moon asserts that at the sentencing phase of his trial, the State introduced as additional aggravating evidence certified copies of Tennessee convictions based on guilty pleas involving seven burglaries, three aggravated assaults, one shoplifting offense, and one escape attempt. After Moon's convictions for the armed robbery and murder of Callahan became final, a Tennessee habeas court voided eight of the guilty pleas because the record failed to show that in each case Moon had been advised of his constitutional rights and made a knowing and intelligent waiver of those rights as required by Boykin v. Alabama, 395 U.S. 238, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969), and Rounsaville v. Evatt, 733 S.W. 2d 506 (Tenn. 1987). Therefore, Moon argues, because his death sentence was based on unreliable evidence, it must be invalidated.

29

The State claims – and the district court appears to have held – that <u>Johnson</u> does not apply here because Moon's vacated guilty pleas were submitted as non-statutory aggravating evidence. In <u>Johnson</u>, on the other hand, the defendant's prior conviction had established one of three statutory aggravating circumstances, which the jury weighed against the mitigating circumstances. Thus, the State argues, there can be no constitutional violation here because the jury rested its death sentence on two statutory aggravating factors unaffected by the Tennessee habeas court.

We need not decide today whether <u>Johnson</u> applies to vacated convictions used as non-statutory aggravating circumstances within the Georgia death penalty scheme because we conclude that Moon's claim is without merit. In order to succeed on his <u>Johnson</u> claim, Moon must prove that the error was not harmless. <u>See</u> <u>Duest v. Singletary</u>, 997 F.2d 1336, 1338 (11th Cir. 1993) (applying the harmless error standard set out in <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993), to <u>Johnson</u> claim on habeas review). Accordingly, the error is not harmless if it resulted in "actual prejudice," which occurs when the error "has substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht</u>, 507 U.S. at 637, 113 S. Ct. at 1722 (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253, 90 L. Ed. 1557 (1946). In our opinion, the error here was harmless.

30

Because the aggravating circumstances in this case are overwhelming, the admission of eight convictions subsequently vacated did not result in actual prejudice. First, the jury found the existence of two statutory aggravating circumstances as prescribed by O.C.G.A. §§ 17-10-30(b)(1) and (b)(2). In particular, the jury determined that (1) Moon had previously been convicted of capital felonies – the armed robberies of Ray York and Peeper's Adult Book Store and the kidnapping of Terry Elkins with bodily injury – and (2) Moon had committed the murder of Ricky Callahan while committing another felony, namely the armed robbery of Callahan. Moon does not contend – nor could he – that any of these convictions was subsequently vacated, and thus the convictions were properly considered by the jury. Second, the State presented to the jury several other instances of violent crime committed by Moon in the month surrounding Callahan's murder: the murder of Jimmy Hutcheson, sodomy of Terry Elkins, and murder of Thomas DeJose. Third, the Tennessee habeas court's vacation of Moon's prior guilty pleas left untouched four convictions of burglary that Moon committed in 1962 and 1965.

Finally, unlike the prosecutor in Johnson, the Georgia prosecution here did not hinge his entire closing argument on the convictions subsequently vacated. True, the prosecution mentioned the guilty pleas and the incidents which they

31

involved, but in the forty-six page transcript of its closing argument, the prosecution confined its comments about the vacated convictions to approximately five pages. Indeed, the gist of the prosecution's argument involved the criminal acts Moon committed in the month surrounding Callahan's murder. Because we find that the admission of the eight convictions later vacated did not have a substantial and injurious effect or influence in determining the jury's verdict, the error was harmless.

## C.

Moon further argues that he was shackled during the sentencing phase of his trial in violation of the Fifth, Eighth, and Fourteenth Amendments. Midway through the sentencing phase, security personnel expressed concerns about his out-of-court behavior and requested that he be put in leg irons. The trial court granted the request and Moon's counsel objected and argued that there had been no "outbursts" to warrant the security measure. When the district court overruled the objection, defense counsel requested permission for Moon and all attorneys to remain seated when the jurors entered to prevent them from seeing the shackles. Moon now contends that his shackling failed to adhere to Eleventh Circuit precedent because the trial court never conducted an evidentiary hearing and because the court failed to consider alternatives to shackling.

Moon hinges his argument on a statement this court made in United States v. Battle, 173 F.3d 1343 (11th Cir. 1999), in which we stated that "shackling . . . a defendant during the sentencing stage of trial [is] unconstitutionally prejudicial where: (1) the defendant was not allowed a hearing to challenge the propriety of the shackles, and (2) the State did not consider alternative restraints." Id. at 1346 (citing Elledge v. Dugger, 823 F.2d 1439, 1451-52 (11th Cir. 1987)). In Elledge, the opinion on which Battle relied, however, there was never any doubt that the jury could see the defendant's shackles. See Elledge, 823 F.2d at 1450 (framing the issue of the case as "whether the appearance in shackles of a defendant whom the jury has just convicted of a gruesome crime is so inherently prejudicial that he is thereby denied his constitutional right"). We hold, therefore, that if the jury cannot see the defendant's shackles, there can be no prejudice. See, e.g., United States v. Mayes, 158 F.3d 1215, 1226-27 (11th Cir. 1998) ("The restraints in this case were not capable of affecting the jury's attitude in any way because the district court took great care to ensure that the jury never saw that the appellants were wearing leg irons."); United States v. Brazel, 102 F.3d 1120, 1158 (11th Cir. 1997) ("Defendants, moreover, have not shown a realistic likelihood that they were prejudiced by what was done, the shackles having been screened from view.").

Accordingly, we deny Moon's claim because the record indicates that the jury was unable to see (or hear) his shackles. In pertinent part, the record reveals the following:

> [Moon's Counsel]: [W]e have blocked the front of the table here and I have checked that the jury can't see from the jury box . . . but it's my personal observation, and I don't think any of the bailiffs or security would dispute that you can see the leg chains as [the jurors] come in. We have, because of that, we would request . . . [that] both counsel for the State and counsel for the defendant and the participants in the trial have been rising as the jury came in and out during these proceedings up to this point."
>
> [Prosecutor]: We can stop doing that, Judge, that's not a problem.
>
> [Moon's Counsel]: Well, the point is, any time he makes any movement to stand, or do anything, the chains rattle, and no matter if we put a wall behind him, the chains are still going to rattle.

Though the trial court never formally ordered the parties to remain seated, Moon points to no evidence that it did not. Therefore, we assume, based on this soliloquy, that Moon remained seated and the jury never saw or heard his leg shackles. Consequently, we find his claim to be without merit.

AFFIRMED.

CARNES, Circuit Judge, concurring in which HULL, Circuit Judge, joins:

I concur in all of Judge Tjoflat's opinion except for the second paragraph of footnote 17. The Supreme Court in Gray v. Netherland, 518 U.S. 152, 165 - 66, 116 S.Ct. 2074, 2082 (1996), held that a state loses the right to assert a procedural default defense to a petitioner's claim in a federal habeas proceeding if the state fails to assert the procedural bar in a timely and appropriate fashion. Which is to say that a state can procedurally default a procedural default defense. Before the Gray decision, this Court had held pretty much the same thing in Esslinger v. Davis, 44 F.3d 1515 (11th Cir. 1995), although the state in that case had not merely failed to raise the defense but had actually disavowed it by affirmatively representing to the district court that the petitioner had not procedurally defaulted his claims, id. at 1525 - 27.

The Esslinger opinion says that even though a state has defaulted on a procedural bar defense by failing to timely raise it or even by disavowing its applicability, the federal court can nonetheless apply the procedural bar against the petitioner's claim if doing so serves important federal interests. See 44 F.3d at 1524. Those statements are dicta. They are dicta because they go beyond the facts of the Esslinger case itself, in which this Court found no important federal interest to override the state's disavowal of any procedural bar. They are dicta because they

are in no way essential to <u>Esslinger</u>'s holding, which is that because of the state's own procedural default of the procedural bar defense in that case the federal court could not enforce that bar against the petitioner.

The second paragraph of footnote 17 of Judge Tjoflat's opinion reiterates in dicta the dicta from <u>Esslinger</u>. Speculation about the possibility of an essential federal interest exception to the rule that a state can waive or default a procedural bar defense is no more essential to our holding here – that Moon's claim should be decided on the merits and it has none – than the same speculation was to our holding in <u>Esslinger</u>. I do not join that dicta and thus express no view on whether such an exception might properly be found if there were ever facts and circumstances to support it.