PUBLISH

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
04/28/99
THOMAS K. KAHN
CLERK

------------------------------------------

No. 97-9027

------------------------------------------

D.C. Docket No. 1:95-cr-528

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ANTHONY GEORGE BATTLE,

Defendant-Appellant.

----------------------------------------------------------------

Appeal from the United States District Court
for the Northern District of Georgia

----------------------------------------------------------------

(April 28, 1999)

Before HATCHETT, Chief Judge, EDMONDSON and BLACK, Circuit Judges.

EDMONDSON, Circuit Judge:

Defendant, Anthony George Battle, appeals his conviction and sentence of death for violating 18 U.S.C. § 1118 as a federal inmate serving a life sentence who murdered a correctional officer. Because we find no error, we affirm.

Background

In 1987, Battle entered the Marine base at Camp Lejeune, North Carolina, and sexually assaulted and murdered his wife, a serving Marine. He was convicted of first-degree felony murder in violation of 18 U.S.C. § 1111(a), aggravated sexual abuse in violation of 18 U.S.C. § 2241(a), and second-degree murder in violation of 18 U.S.C. § 1111. He was sentenced to life in prison.

Battle was moved around some and eventually transferred to the United States Penitentiary-Atlanta ("USP-A") in 1993. On 21 December 1994, a correctional officer at USP-A, D'Antonio Washington, was found lying on the floor in Cellhouse C with blood spurting out of his head. When prison employees rushed to the scene, they found Battle standing next to a nearby vending machine. His clothing was splattered with blood. A hammer with fresh blood, which was later determined to be Officer Washington's blood, was found behind the vending machine. Richard Boone, an inmate allowed to carry tools, had loaned the hammer to Battle to fix something in his cell. (Medical examiners later testified that Officer Washington was felled by three great blows to the head with a hammer.)

2

On the day of Washington's death, Battle made an incriminating statement, which was eventually suppressed; but he later confessed again to a correctional officer. Later, federal agents interrogated Battle; and he told them he was "frustrated" at USP-A and that he was "tired of being bossed around." Battle said that he took the hammer and decided to attack the first correctional officer he saw. Battle was charged with Officer Washington's murder.

In December 1995, Battle filed a notice to rely upon an insanity defense. The Government filed notice of its intention to seek the death penalty in July 1996.[1] In December 1996, the district court judged Battle competent to stand trial.

After 21 December 1994, but before trial, Battle had committed three separate incidents of violence, prompting serious safety concerns about the trial. The district court conducted a hearing, considered different restraints, and consulted with the United States Marshals. The district court then determined, in the light of Battle's specific history of violence, definite precautions were needed. Battle stood trial wearing leg shackles and a black velcro belt to restrain his hands. The tables for both parties were draped, however, to hide the shackles; and Battle was given a black sweater to camouflage the black velcro belt.

At trial Battle testified in his own defense and admitted to killing Officer Washington. Battle also testified about delusions and hallucinations, which formed

---

[1]The Government amended this notice after the verdict to include additional specific incidents of violence suggesting future dangerousness.

the basis for his insanity defense. Battle was convicted of murder under section 1118, and the jury recommended a sentence of death. Battle filed a motion for a Judgment of Acquittal and New Trial. The district court denied the motion, and Battle appealed.[2]

Discussion

I. Restraints in Presence of the Jury

---

[2]On appeal, Battle raises thirteen separate issues: (1) the Government violated Miranda through improper custodial interrogations; (2) the court denied Battle a fair trial by forcing him to appear before the jury in shackles and arm restraints and for, part of the time, in a prison jumpsuit; (3) the court improperly excluded evidence pertaining to provocation and denied Battle a voluntary manslaughter charge; (4) the court denied Battle the ability to call an expert witness in surrebuttal to rebut the Government's expert testimony about the results of a psychological test; (5) the court improperly excused two jurors who were opposed to the death penalty but who could have carried out their duties; (6) the court failed to conduct a sufficient inquiry of jurors on the extent of their pro-death penalty views; (7) the Government was improperly allowed to amend its notice of intent to seek the death penalty on the eve of sentencing; (8) the court erroneously allowed prison officials to testify as to the deterrent effect of the death penalty; (9) the Government's closing argument was improper; (10) the court improperly submitted statutory aggravating factors 18 U.S.C. § 3591(a)(2)(A),(B) and (D) as well as 18 U.S.C. § 3592(c)(6) to the jury; (11) the court failed to instruct the jury on all potential mitigating circumstances; (12) the death penalty statute's delegation of the mode of execution to the state violates the Constitution; and (13) electrocution is a cruel and unusual mode of punishment. Upon careful review, we conclude that issues 1, 3, 4, 5, 6, 9, 10, 11, and 13 lack serious merit and will not be discussed.

4

Battle contends that the district court's requirement that he appear wearing leg shackles and arm restraints in court during the trial -- particularly when a less conspicuous "stun apparatus" was available -- was inherently prejudicial. Battle also contends the district court at the least should have granted his wish not to be present in court.[3] We disagree. The district court's decisions were careful and informed judgments permitted by the Constitution.

About the restraints, in <u>Elledge v. Dugger</u>, 823 F.2d 1439 (11th Cir. 1987), we set out some guides for shackling a defendant in court. There, the court held the shackling of a defendant during the sentencing stage of trial unconstitutionally prejudicial where: (1) the defendant was not allowed a hearing to challenge the propriety of the shackles, and (2) the State did not consider alternative restraints. <u>See</u> <u>id</u>. at 1451-52.

---

[3]Battle also claims he was prejudiced by appearing at the voir dire of prospective jurors while he was wearing his orange prison jumpsuit and was restrained. The reason Battle appeared in the jumpsuit was that he refused to wear the civilian clothes which had earlier been provided to him and which the trial court expected him to wear. He wore the jumpsuit for part of one day only at the beginning of a trial in which the guilt-or-innocence phase took altogether about thirteen days. In addition, given the nature of the charge against Battle and the limited nature of his defense, jurors knew from the start of the trial that he had been convicted of another crime and was, therefore, a prisoner already. In the light of the circumstances, the trial court did not commit reversible error in declining to grant defense counsel's motion for a mistrial. Moreover, the mistrial motion -- which was based on the prison clothing and the restraints -- was made not when Battle first appeared in court in the jumpsuit, but after the voir dire process was underway at the end of the pertinent day.

In United States v. Brazel, 102 F.3d 1120 (11th Cir. 1997), we again considered the shackling issue; this time, it was in the context of the guilt-innocence stage of trial. After hearing from both sides, listening to the United States Marshals, gauging the dangerousness of the defendants' behavior, and considering alternative solutions, the district court in Brazel concluded the best course of action was to shackle the defendants and put cloth around the table so the shackles would not be visible to the jurors. See id. at 1156-58. This decision -- which is one "within the sound discretion of the trial court", United States v. Theriault, 531 F.2d 281, 284 (5th Cir. 1976) -- was upheld. See Brazel, 102 F.3d at 1158.

Our case is like Brazel. First, some kind of restraint was doubtlessly needed. Battle had committed not only two brutal homicides, but -- since the last homicide -- three separate attacks on correctional officers. He had attacked without warning. In two instances he attacked using a concealed, sharpened instrument. The district court judge in this case rightfully feared for the safety of her courtroom; but as in Brazel, the trial court conducted a hearing at which both attorneys were heard, considered alternative means (including the hidden stun apparatus)[4], and then took reasonable steps to hide the chosen restraints from the jury: among other things, cloth was draped from the table to hide the leg shackles, and Battle was given a black sweater to

---

[4]On the stun apparatus, the trial court was worried that the reaction time would be too slow and that, if the apparatus was actually used to stun Battle, a mistrial would have to be granted.

disguise the black arm restraints. We cannot say the district court abused its discretion.

Second, for Battle's related claim that he waived his right to be present in court, we are confident that the district court handled this issue without reversible error.[5] At any rate, no prejudice arose given the precautions taken to disguise the safety restraints from the jury.

## II. Amendment of Notice of Intent

Battle claims that it was improper for the trial court, on the eve of the sentencing proceedings, to allow the Government to amend its 18 U.S.C. § 3593(a) notice of intent to seek the death penalty. Battle claims that in doing so, the district

---

[5]First, a waiver by a capital defendant of his right to be present is an exceedingly important waiver of rights and would have, at a minimum, been carefully scrutinized on appeal if the district court allowed it. See United States v. Gordon, 829 F.2d 119, 125 (D.C. Cir. 1987) (stating that every reasonable presumption against waiver of the right to be present will be applied and holding no voluntary waiver had occurred). This risk of error is particularly real where, as here, the defendant is also arguing some sort of diminished-capacity defense. When a defendant contends he cannot be held responsible for committing an act like murder, he might also be creating an implicit issue about whether he can be held responsible for waiving a constitutional right. Second, some authority exists to the effect that a custodial defendant has no right to refuse to be present. See, e.g., Diaz v. United States, 223 U.S. 442, 455 (1912) ("[Our courts] have regarded an accused who is in custody and one who is charged with a capital offense as incapable of waiving the right [to be present.]"). Battle points us to no case demonstrating how his rights were violated.

7

court violated section 3593(a) as well as the Fifth, Sixth, and Eighth Amendments to the Constitution. The Government counters that it only amended the notice to include specific evidence supporting an aggravating factor -- future dangerousness -- already in the original notice.

We agree with the Government; nothing in the federal statute or Constitution prevents such an amendment. Section 3593(a) requires the Government to submit notice of, among other things, the "aggravating factor or factors" it intends to rely on as grounds for the death penalty. 18 U.S.C. § 3593(a)(2). If the Government wants to add additional aggravating factors to its list, "[t]he court may permit the attorney for the government to amend the notice upon a showing of good cause." Id. The term "aggravating factor" in the statute refers to section 3592 and its statutory and non-statutory aggravating factors. Notice of factors -- which include things like heinousness of the killing, see id. § 3592(c)(6), or vulnerability of the victim, see id. § 3592(c)(11) -- is different from notice of specific evidence. See id. § 3592(b)-(d); see also United States v. Nguyen, 928 F. Supp. 1525, 1545-46 (D. Kan. 1996) (holding Government's notice of intent permissible even though "it list[ed] only the aggravating circumstances and provide[d] no detail about the evidence the government intend[ed] to offer in support").

The Government is not required to provide specific evidence in its notice of intent. So, when it seeks to amend that notice to add only specific evidence -- and not new "factors", it does not need to show good cause; if anything, the Government is

8

helping the defendant some by forewarning him of the evidence to be used against him.

Assuming, for the sake of argument, that good cause is needed even when the Government seeks just to notify the defendant of additional evidence, the Government met that burden. At least one of the instances of violence added to the notice occurred after the filing of the original notice and certainly had a bearing on the factor of future dangerousness. Also, about lack of prejudice, the Government gave Battle thirty-days' notice of its intent to rely on these other acts of violence and gave him a list of witnesses. Good cause was shown. See United States v. Pretlow, 770 F. Supp. 239, 242 (D.N.J. 1991) (applying related statute and determining good cause shown where (1) new factors have plausible connection to facts, (2) no deliberate delay by Government, and (3) no prejudice to defendant).

## III. Prison Guard Testimony

Battle argues that the district court erred in permitting three prison guards to testify on the effects of Officer Washington's death on the particular prison and, also, the impact a death sentence would have at the prison. We have set out all the pertinent testimony in an appendix to this opinion, but Officer Layfield's testimony was representative of the officers' testimony:

9

Q.    If the sentence that the jury renders [in this case] is a life without parole sentence, how do you think that would affect the inmates in the institution?

A.    The inmates already have an attitude.  Once they receive a lengthy sentence or life imprisonment, that's all that can happen to them.  So, I believe the situation would worsen.  Without the death penalty, all prisoners, they believe there is nothing that can happen to them.

. . . .

Q.       Did you see a change among the inmates after [Officer Washington] was killed?

A.    Of course, yes Ma'am.

Q.    What kind of change?

A.     When you went to enforce policy, they would be walking around saying things like, "hammer time," or, "Don't forget I got 20 years.  I'll be here every day with you."   Basically it was threats toward staff members.

. . . .

Q.    How do you think rendering a death penalty verdict sentence would impact the institution, the inmates, and the correctional officers?

10

A. I believe the staff at the penitentiary already act in a very professional manner. I believe the inmates would think several times before they continue with the same attitude that they have.

This testimony, Battle contends, was victim impact testimony introduced in violation of Booth v. Maryland, 482 U.S. 496, 508-509 (1987), overruled in part by Payne v. Tennessee, 501 U.S. 808 (1991). In addition, Battle says the law of this circuit does not permit "deterrence" evidence and to hold otherwise would open the floodgates: every future capital case would include a trial on whether or not the death penalty deters criminal conduct. Moreover, if this evidence is permissible, Battle argues, the Government deliberately misled him about the nature of the testimony and allowed him no time to find, and to respond with, witnesses of his own.

We cannot say the district court erred here. The guards' victim impact testimony was relevant and permissible. The heart of their testimony was to describe the harm caused at the Atlanta prison by the murder of a correctional officer who was killed just because he was a correctional officer.[6]

---

[6]Briefly stated, the guards' testimony told the jury that the harm caused by Battle's killing Officer Washington was not simply to take a life, but also to embolden other prisoners, to increase the harassment of guards by prisoners, and to increase the stresses on the prison staff (making them feel less safe) in the peculiar environment of a prison in which many inmates are already serving life sentences or long sentences.

These prison guard witnesses are not family members of the slain officer; these are prison officials specifically contemplated and protected by the pertinent statute. Furthermore, their testimony, unlike the victim impact testimony in Booth, was neither "inflammatory" nor "emotionally charged." The testimony in question here (a handful of questions for each of the three guards) consisted of short, matter-of-fact descriptions of the effect Officer Washington's murder had and the effect the sentence in this case would have on the prison population and guards at this particular prison (USP-A); no prison official described Battle as a beast who must be killed (as was the case in Booth); no official conveyed hatred toward Battle or the viciousness of his crimes (as was the case in Booth); in short, no prison official could have been said to have inflamed the jury.[7]

For Battle's death-as-a-deterrent argument, his reliance on Lockett-type cases like Martin v. Wainwright, 770 F.2d 918 (11th Cir. 1985), to show that deterrence evidence is inadmissible is misplaced. The evidence in this case was not about deterrence as deterrence is normally discussed in our cases. Cf. id., 770 F.2d at 935 (discussing trial court evidence "consist[ing] of the testimony of law professor Hans

---

[7]By the way, footnote ten in Booth, to the extent this portion of Booth survived Payne, says the Court does not disapprove of all victim impact testimony: "Similar types of information may well be admissible because they relate directly to the circumstances of the crime." Booth, 482 U.S. at 507 n.10. Here we might have such information: spotlighting the vulnerability of prison guards, like Officer Washington, to fatal attacks like the one in this case, where the victim was selected simply because he was a guard.

12

Zeisel of the University of Chicago, who sought to tell the jury that (1) in general, the death penalty has no proven deterrent effect, and (2) in particular, the death penalty does not deter the mentally ill."); see also Malone v. Vasquez, 138 F.3d 711, 714 (8th Cir. 1998) (discussing the sentencing stage testimony of "Professor James Gilsinan that the death penalty is not an effective deterrent."). The evidence in this case was not about the power of the death penalty to deter future crimes in some general or abstract sense. No studies were shown; no data was introduced; no professors spoke. The parties presented no evidence "designed to persuade the sentencer that the legislature erred, in whole or in part, when it enacted a death penalty statute." Martin, 770 F.2d at 936.

This case was one where three prison officers briefly discussed a crime committed against a fellow officer (just because he was an officer) and the harmful ripple effects the crime had had on USP-A. Whether or not the death penalty deters murder as a general matter is a legislative judgment: not a question for juries. But, the harmful effects of a murder of a correctional officer (on account of his official capacity) at the specific prison in which he worked is a different and more narrow matter. This kind of specific and particularized testimony about the nature of the actual act being prosecuted and about its consequences for the prison's staff is not barred by the law. If deterrence was touched on in a local context, that circumstance

does not alter the substance of the testimony.[8] The testimony was, at root, about harm to the Atlanta prison staff -- how the murder of a coworker and the resulting sentence for his killer would affect them -- and not much about actually deterring murders in the future.

Moreover, even if the prison-guard testimony here reached the impermissible point (which we think it did not), it was not reversible error. "Admission of [victim impact] evidence will only be deemed unconstitutional if it is so unduly prejudicial that it renders the sentence fundamentally unfair." Gretzler v. Stewart, 112 F.3d 992, 1009 (9th Cir. 1997). The evidence was not unduly prejudicial in this case because the testimony was a small portion of a week-long sentencing hearing where the Government proved many statutory aggravators.

On the notice question, Battle is right to say that the Government was misleading about the nature of the guards' testimony. The pretrial letter from the prosecutor to Battle's counsel described the three officers as "personal friends of Officer Washington's who may testify at the sentencing hearing regarding what kind of person Officer Washington was."

_____

[8]Battle's cases are also inapposite because they speak to a different question of whether a defendant's proffered testimony on lack of deterrence constitutes relevant mitigating evidence about a defendant's character or circumstances of the offense which, under Lockett, must constitutionally be considered by the trier of fact. Those cases did not decide whether deterrence testimony is altogether impermissible.

The first time Battle's counsel heard anything to the contrary was in a conference in the judge's chambers on the first day of the sentencing proceedings. While that is short notice to find and to prepare rebuttal witnesses, the burden was on defense counsel -- if he thought he might find and use such witnesses -- to move for a continuance. If not at that very moment, then later in court when the nature of the testimony was clear, defense counsel needed to do more than object to the guards' evidence; counsel -- if he seriously thought more time would help him -- needed to move to delay the proceedings. See O'Donnell v. Georgia Osteopathic Hosp., Inc., 748 F.2d 1543, 1549 (11th Cir. 1984) ("[T]he remedy for coping with surprise is not to seek reversal after an unfavorable verdict, but a request for continuance at the time the surprise occurs.") (quoting Szeliga v. General Motors Corp., 728 F.2d 566, 568 (1st Cir. 1984)).

Having determined that the district court did not err in allowing this testimony under the circumstances and that the short notice was not met with a motion for a continuance, we conclude that the district court did not commit reversible error.

### IV. Constitutionality of the Statutory Scheme

Section 3596 provides "A person who has been sentenced to death pursuant to this chapter . . . . [shall be put to death] in the manner prescribed by the law of the

15

State in which the sentence is imposed."  18 U.S.C. § 3596(a).  In Georgia, the mode of execution is electrocution.  See O.C.G.A. § 17-10-38(a).

This provision is a constitutional delegation of federal power.  See J.W. Hampton, Jr., & Co. v. United States, 276 U.S. 394, 409 (1928) (holding congressional delegations of power permissible as long as Congress "lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the authority] is directed to conform"); see also United States v. Tipton, 90 F.3d 861, 901-903 (4th Cir. 1996) (holding a federal death penalty statute did not violate anti-delegation doctrine even though, at that time, it provided no mode of execution).

AFFIRMED.

APPENDIX


Officer Schealey


Q.    Officer Schealey . . . did you see an effect on the inmates at USP Atlanta following [Officer Washington's] death?

A.    Yes.

Q.    And what kind of effect was that?

A.    Everybody is walking around smiling now, and if an officer tells an inmate to do something, he would said, "He need to leave me alone, or I'll get a hammer after you." You see people walking around saying, "hammer time, hammer time."

Q.    Do you think the murder of Officer Washington would have improved inmate Battle's status within the prison among inmates?

. . . .

A.    Yes. Everybody been talking about the incident ever since it happened. So, they talk about the inmate also.

Q.    And they would refer to Mr. Battle himself?

A.    Yes.

. . . .

17

Q.   How would the effect of the death penalty being rendered as a verdict in this case or as a sentence in this case affect the correctional officers at USP Atlanta and BOP?

A.   Well, it would just let us know if the inmate want to assault a staff member or kill a staff member, he know he going to get a death penalty trial.

Q.   How would you think it would affect the inmates?

A.    It would have them thinking twice before they assault an officer or a staff member.

Q.   And in the event that a life sentence were imposed, how do you think that would affect correctional officers?

A.   It would have a hard setting on the staff members because we know an inmate doing 99 years, and he know if he kill an officer, what is he going to get?  Another 99 years, but what is that to him?  And it have an impact on the officers.  We got to realize we got to work in this kind of environment, and if an inmate is going to assault us, he's not going to get but just another 99 years plus the 99 he already have.


Officer Layfield


18

Q.     If the sentence that the jury renders [in this case] is a life without parole sentence, how do you think that would affect the inmates in the institution?

A.    The inmates already have an attitude. Once they receive a lengthy sentence or life imprisonment, that's all that can happen to them. So, I believe the situation would worsen. Without the death penalty, all prisoners, they believe there is nothing else that can happen to them.

Q.     Are there a lot of people doing life sentences at USP Atlanta or lengthy sentences that are essentially a life sentence?

A.     Yes, Ma'am.

Q.    Did you see a change among the inmates after [Officer Washington] was killed?

A.    Of course, yes, Ma'am.

Q.    What kind of change?

A.    When you went to enforce policy, they would be walking around saying things like, "hammer time," or, "Don't forget I got 20 years. I'll be here every day with you." Basically it was threats toward staff members.

. . . .

Q.    How do you think rendering a death penalty verdict sentence would impact the institution, the inmates, and the correctional officers?

A. I believe the staff at the penitentiary already act in a very professional manner. I believe the inmates would think several times before they continue with the same attitude that they have.

## Officer Hawkins

Q. What kind of reaction did you get from [the inmates] in regard to [Officer Washington's] murder?

A. At that particular time I believe I was working in the special housing unit, which is where inmates are housed that have committed infractions against the Bureau of Prisons, and some inmates would like taunt us about him being killed. If they didn't like something we were telling them to do, they would say something like better watch it. I'm going to get that hammer. There were very cruel, ugly things about his death that they would throw back up in our face.

Q. If the jury were to impose the death penalty in this case, do you have an opinion about what impact that would have on . . . the operation of USP Atlanta in terms of the staff and the security issues that you have there?

A.    I believe that this would send a very clear signal to the inmates and staff members as well that you cannot commit this type of infraction.  You cannot kill a staff member and just absolutely nothing be done about it.

Q.    Do you have an opinion about what impact the imposition of a life sentence would have on . . . the issue of security, and the relationship to the staff, and dealing with the inmates at the institution?

A.    If a person is already serving a life sentence, what is giving them another life sentence going to do?   You can kill a staff member, and nothing is going to happen except you are going to remain in jail.  You are going to do that anyway.  Most of the inmates we have housed there are never getting out of there.  So, they figure, well, if I kill a staff member and all I have to do is stay in jail, what's to prevent me from doing it again?  Nothing.