[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 04-15597

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 2, 2006
THOMAS K. KAHN
CLERK

D. C. Docket No. 02-00038-CR-01-RWS

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

WILLIAM EMMETT LECROY, JR.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(March 2, 2006)**

Before TJOFLAT, ANDERSON and MARCUS, Circuit Judges.

ANDERSON, Circuit Judge:

The defendant/appellant, William Emmett LeCroy, Jr. ("LeCroy") was convicted in the Federal District Court in the Northern District of Georgia of taking a motor vehicle from a person, Joann Lee Tiesler, by force and violence resulting in her death, in violation of 18 U.S.C. § 2119(3) ("carjacking"). After the penalty phase, the jury returned a death sentence. LeCroy filed a motion for a new trial, which was denied.

LeCroy appeals to this Court on the following separate issues, claiming the district court erred: (1) by failing to conclude that <u>Ring v. Arizona</u>, 536 U.S. 584, 122 S.Ct. 2428 (2002) rendered the Federal Death Penalty Act unconstitutional, (2) by refusing to give a jury instruction on "simple" carjacking as a lesser included offense, (3) by upholding his conviction despite insufficient evidence, (4) by admitting 13 year old evidence allegedly seized in violation of the 4th Amendment, (5) by improperly admitting evidence of bad acts from 1991, in violation of Federal Rule of Evidence 404(b), (6) by allowing a federal agent to testify as to his opinion about blood transfer patterns on a piece of the victim's clothing, (7) by preventing the presentation of mitigating evidence in violation of the 8th Amendment, (8) by admitting evidence of aggravating circumstances that went beyond the issues presented in the government's Notice of Intent to Seek the Death Penalty, and finally (9) by instructing the jury inaccurately on the

nonstatutory aggravating factor of future dangerousness.[1]

After careful consideration of all of the issues, we reject each of LeCroy's arguments, and affirm his conviction and sentence of death.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Mr. LeCroy is on death row for the murder of Joann Tiesler in October 2001, but events that occurred well before her death are relevant to this case. We begin in 1989, when LeCroy was 19 years of age. After leaving the Army, LeCroy spent time at the home of his mother and stepfather, Donna and Sam Houston. Houston had two daughters, one of whom, Alecia, was 13 years old and lived with her father. LeCroy and Alecia began a sexual relationship that the parents discovered in January of 1990. Alecia's mother–Sam Houston's former wife–urged the authorities to prosecute LeCroy for statutory rape.

Around the same time, Cobb County police were investigating a series of burglaries in a residential neighborhood occurring in late 1990 and early 1991, and

---

[1]     LeCroy also filed a challenge to the method of selecting jurors in the Northern District of Georgia, specifically in the Gainesville Division. He claimed that Hispanics were under-represented in the master jury wheel from which the petit jury and grand jury is drawn. LeCroy's claim fails because he failed to proffer any evidence of the relevant population–the percentage of the Hispanic population that is eligible for jury service. Our cases have held that the relevant comparison is the difference between the percentage of the distinctive group among the population eligible for jury service and the percentage of the distinctive group on the jury wheel. United States v. Grisham, 63 F.3d 1074, 1078 (11th Cir. 1995); United States v. Pepe, 747 F.2d 632, 649 (11th Cir. 1984). Thus, we need not address LeCroy's several arguments challenging the jury selection.

3

Cobb County Detective Kevin Flynn identified LeCroy as a suspect. On March 3, 1991, LeCroy was arrested following a traffic stop. In his car police found a holster and gun and several hand-written notes. One of the notes described a plan to "rob cars and kill people driving so the car can be used two or three days." Another listed steps to take in case of being chased, including "burglarize house," "flee and switch cars," "be ruthless and famous," and "rape rob and pillage [sic]." A third document had "H-L" written at the top and contained a list of names; authorities contended this was a "hit list" of people LeCroy wanted to kill.

The investigation and evidence discovered in LeCroy's car resulted in multiple state charges, and authorities decided to simultaneously prosecute LeCroy for his relationship with Sam Houston's daughter and for burglary. In August of 1991, LeCroy was sent to prison in Georgia for aggravated assault, burglary, child molestation, and statutory rape. As he was serving his sentence for those crimes, he was charged and convicted under federal law of possession of a sawed-off shotgun, an item he had obtained during one of the burglaries. He served an additional five years in prison, this time in a federal facility.

LeCroy was released from federal custody in August 2001. Upon his release, he began serving a three-year term of supervised probation and moved into the home of his mother and stepfather, Mr. Houston, on Cherry Log Mountain

4

in Gilmer County, Georgia.

As a condition of his supervised release, and because of his prior convictions for statutory rape and aggravated child molestation, LeCroy was ordered to undergo a psychosexual evaluation in September of 2001. LeCroy prematurely left the evaluation, and only agreed to return to submit to the testing after being warned by his probation officer that he risked being sent back to prison if he refused again. The evaluation was rescheduled for October 22nd, 2001. The government argues that despite agreeing to be retested, LeCroy had decided to flee.

In the weeks preceding Ms. Tiesler's death, LeCroy's stepfather was growing concerned about his stepson's behavior. Mr. Houston testified that LeCroy spent a great deal of time on the computer, rarely leaving his bedroom. Later investigation of the computer showed that it had been used to search for survival gear, and to scan and copy Mr. Houston's passport. On the back of the letter scheduling his original psychosexual evaluation, which was later found by police, LeCroy wrote out a "need to acquire" list of items he intended to collect. These included binoculars, boots, gloves, guns, ammunition, and food and water.

On Friday, October 5th, Donna and Sam Houston left LeCroy alone at the Cherry Log cabin, informing him that they would be gone until the night of

5

October 8th. This was the first time since his release from prison that Mr. LeCroy was left alone at the home. A series of robberies on Cherry Log Mountain occurred over the weekend of October 5th – 7th, 2001, including the theft of medical supplies, a shotgun, and ammunition from homes in the neighborhood. Several weeks before Ms. Tiesler was killed, LeCroy purchased camouflage makeup and plastic cable ties. The government contends that the purchases and the robberies were part of LeCroy's plan to collect the items from his need to acquire list and flee the country.

It is undisputed that at some point on the evening of Sunday, October 7th, LeCroy broke into the home of Joann Tiesler, who lived in the same neighborhood as LeCroy's stepfather. Entering through a bedroom window that overlooked a porch, LeCroy took steps to return the open blinds of the window to their original position so that it would look undisturbed from the outside. At the time of the break-in, LeCroy was armed with a loaded shotgun, a knife, and plastic cable ties.

Ms. Tiesler had spent the weekend in Rome, Georgia at the house of her fiancee. Around 5:40pm on October 7th, Tiesler was seen driving up the mountain toward her cabin. She entered her home and placed her purse on an island in the kitchen. Soon after that LeCroy attacked her, striking her in the back of the head with the shotgun and discharging it in the hallway outside her

6

bedroom.  He bound her hands behind her back with cable ties and strangled her with an electrical cord.  Still alive, Ms. Tiesler was stripped of her underwear and forced to kneel at the foot of her bed, where she was raped and then anally sodomized. Semen found in Tiesler's body was identified as that of LeCroy.

After raping her, LeCroy slashed Tiesler's throat with the knife.  Doctors determined that this was likely the fatal wound, as the knife severed the external jugular vein, right internal jugular vein, and right carotid artery, penetrating down to Tiesler's cervical vertebrae.  Finally, LeCroy stabbed Tiesler five times in the back and wiped his knife off on her shirt.  She was left naked and bound on her bed, and was discovered the next day by a co-worker and a real estate agent.

After killing Ms. Tiesler, LeCroy took her keys and her car, a Ford Explorer, loaded it up with some supplies, and headed for Canada.  Two days later, on Tuesday, October 9th, 2001, LeCroy was captured at the border between Minnesota and Canada driving Ms. Tiesler's vehicle.  Inside police found a knife stained with Tiesler's blood; a map with writing on the back;[2] a separate written note;[3] and plastic cable ties like those LeCroy used to tie up Ms. Tiesler.  Police

---

[2]    The writing on the map said: "Please please please forgive me Joanne [sic].  You were an angel and I killed you. Now I have to live with that and I can never go home.  I am a vagabond and doomed to hell."

[3]    The note said: "Please call the police and report this vehicle as stolen. Thanks, The Thief."

also discovered two unspent shotgun shells, boots, food, water, ammunition, gloves, and other items from LeCroy's need to acquire list.

LeCroy was indicted in the United States District Court for the Northern District of Georgia on May 15, 2002 for taking a motor vehicle by force, violence, and intimidation from Joann Tiesler resulting in her death, in violation of 18 U.S.C. §2119 (3). A superseding indictment added special death-eligibility allegations subsequently found by the grand jury on August 13, 2002.

Before trial, LeCroy filed a series of motions, all of which were denied. LeCroy was convicted on March 1, 2004. At the conclusion of the sentencing phase, the jury returned a death sentence, and LeCroy was remanded to federal custody at the United States Penitentiary in Terre Haute, Indiana. This appeal followed.

## II. DISCUSSION

### A.  The Constitutionality of the Federal Death Penalty Act

LeCroy makes two constitutional arguments. We review challenges to the constitutionality of a statute *de novo*. United States v. Scott, 263 F.3d 1270, 1271 (11th Cir. 2001). A concise summary of the relevant provisions of the Federal Death Penalty Act ("FDPA") will aid our discussion. To render LeCroy eligible for the death penalty under the FDPA, the government was required to prove

beyond a reasonable doubt any one of the statutory intent factors set out in 18 U.S.C. § 3591(a)(2), and in addition was required to prove any one of the statutory aggravating factors set out in § 3592(c). Such proof would render LeCroy eligible for the death penalty. If no § 3592 statutory aggravating factor is found to exist, then the death penalty is not authorized. 18 U.S.C. § 3593(d). In addition to statutory aggravating circumstances, the government may prove nonstatutory aggravating circumstances. 18 U.S.C. § 3592(c)(last sentence), § 3593(a). However, the government must give notice pursuant to § 3593(a) of both statutory and nonstatutory aggravating factors. Id., § 3592(c) ("The jury, or if there is no jury, the court, may consider whether any other aggravating factor for which notice has been given exists.").

First, LeCroy argues that the FDPA is facially unconstitutional under the Indictment Clause of the Fifth Amendment because it does not require prosecutors to charge aggravating factors in the indictment. In the instant case, the superseding indictment did charge all statutory aggravating factors which the jury found. Therefore, for purposes of this decision, we can assume *arguendo*, without expressly deciding, that at least one statutory aggravating factor must be included in the indictment.[4] This forms the predicate for LeCroy's argument, and this

---

[4]    Other circuits have so held. See United States v. Allen, 406 F.3d 940 (8th Cir. 2005); United States v. Robinson, 367 F.3d 278 (5th Cir. 2004); United States v. Barnett, 390

9

predicate is based upon <u>Ring v. Arizona</u>, 536 U.S. 584, 122 S.Ct. 2428 (2002),

<u>Apprendi v. New Jersey</u>, 530 U.S. 466, 120 S.Ct. 2348 (2000), and <u>Jones v. United</u>

<u>States</u>, 526 U.S. 227, 119 S.Ct. 1215 (1999).  From this predicate LeCroy derives

his argument that the FDPA is inconsistent with <u>Ring</u> in that <u>Ring</u> is the

culmination of Supreme Court case law and its progeny which contemplates that

facts which increase the statutory maximum sentence must be found by the jury

beyond a reasonable doubt and defendants must be placed on notice thereof by

inclusion of same in the indictment.  In contrast to that contemplated procedure,

LeCroy argues that the FDPA does not provide for inclusion in the indictment of

the statutory aggravating factors (which do increase the statutory maximum

sentence to make a defendant eligible for the death penalty).  Rather, the statute

specifies that the government attorney shall, a reasonable time before trial, serve

notice upon the defendant setting forth the aggravating factor or factors that the

government proposes to prove.  18 U.S.C. §3593(a).  LeCroy argues that this

alleged inconsistency renders the statute facially unconstitutional.

　　　　Every circuit court of appeals which has addressed this argument has

---

F.3d 775, 784-88; <u>but see</u> <u>United States v. Wills</u>, 346 F.3d 476 (4th Cir. 2003).  Also, in an analogous context, this circuit has indicated that if the sentence actually imposed was increased on the basis of a  particular fact beyond the statutory maximum otherwise permissible absent that fact, then that fact should be included among the facts charged in the indictment.  <u>United States v. Sanchez</u>, 269 F.3d 1250, 1278 and n.52 (11th Cir. 2001) (en banc).  Although we need not decide the issue in this case, a careful prosecutor will of course charge in the indictment the relevant statutory aggravating circumstances.

rejected it. United States v. Allen, 406 F.3d 940, 949 (8th Cir. 2005); United States v. Barnette, 390 F.3d 775, 788-90 (4th Cir. 2004); Robinson, 367 F.3d 278, 290,(5th Cir. 2004). We agree with our sister circuits. The major flaw in LeCroy's argument is that nothing in the Act forbids, or is inconsistent with, prosecutors' taking the additional step of including the statutory aggravating factors in the indictment and submitting same to the grand jury. Indeed, a statute will seldom expressly provide for submitting elements of an offense to the grand jury. It is simply well established law–the background against which statutes are enacted–which indicates that elements of a crime should be submitted to the grand jury. What the defendant classifies as an improper "cure" of a problem is really the government's attempt to comply with the complex legal backdrop of federal death penalty prosecutions. Accordingly, we reject LeCroy's assertion that the Federal Death Penalty Act is unconstitutional on its face in light of Ring and related cases.

LeCroy's second challenge to the constitutionality of the FDPA is based upon the same case law, i.e. Ring and related cases. LeCroy expands his argument beyond our assumption that at least one statutory aggravating factors must be charged in the indictment. LeCroy argues that *all* aggravating factors–both statutory and nonstatutory–that the government intends to present against the

11

defendant must be included in the indictment.  As noted above, the issue with regard to statutory aggravating factors is moot in this case.  With respect to nonstatutory aggravating factors, we are once again not the first court to have faced this issue.

In Higgs v. United States, 353 F.3d 281, 298-99 (4th Cir. 2003), the 4th Circuit held that indictments in death-eligible murder cases need only include one statutory aggravating factor in order for the FDPA to be applied in a manner satisfying constitutional requirements.  This is so because if at least one statutory aggravating factor is included in the indictment and found by the jury, then the defendant is eligible for the death penalty.  The court concluded that nonstatutory aggravating factors need not be added to an indictment noting that nonstatutory aggravators do not in any event, and cannot by themselves, increase the available punishment.  The court concluded that if one statutory aggravator was included in the indictment and found by the jury, then "[a]ny additional statutory or nonstatutory aggravating factors may be fairly viewed as sentencing considerations." Id. at 299.

The 5th Circuit has reached the same conclusion.  In United States v. Bourgeois, 423 F.3d 501 (5th Cir. 2005), the defendant claimed constitutional error because the government had failed to charge the statutory and nonstatutory

aggravating factors in the indictment. As in the case at bar, a second, superseding indictment was brought alleging the statutory aggravating factors. Bourgeois argued that nonstatutory aggravating factors needed to be included in the indictment after <u>Ring</u> because they exposed the defendant to a higher level of punishment. The court dismissed the defendant's argument about the statutory factors because, as in LeCroy's case, the statutory factors were "expressly charged in the second, superseding indictment." <u>Id.</u> at 507. As to the nonstatutory aggravating factors, the court concluded that the holding from <u>Ring</u> did not require their inclusion in the indictment: "Alone, non-statutory aggravating factors cannot make a defendant eligible for a death sentence. This is because the jury proceeds to consider non-statutory aggravating factors only after the defendant is determined to be death-eligible. Accordingly, it was neither constitutional nor statutory error for the non-statutory aggravating factors to be omitted from the indictment." <u>Id.</u> at 507-08.

We agree with our sister circuits. We hold that *nonstatutory* aggravating factors need *not* be included in the indictment. Nonstatutory factors are considered only after a defendant has been rendered death-eligible by a finding–from both the grand and petit juries–of the normal elements of the crime (including *mens rea*) and at least one statutory aggravating factor. Nonstatutory

13

factors do not operate to increase the potential punishment of a defendant, thus potentially triggering the indictment requirements suggested in Jones. Rather, they are considered by a jury only when determining how a death-eligible defendant should be sentenced: to life in prison or death. Failure to include them in the indictment does not violate the requirements of the relevant case law, and does not constitute constitutional or statutory error.

For the foregoing reasons, we reject LeCroy's constitutional challenges.[5]

B. The Absence of a "Simple Carjacking" Lesser Included Offense Instruction.

The defendant's next ground of appeal attacks the jury instructions given at his trial. LeCroy argues that the jury should have been allowed to find him guilty of a lesser included offense, i.e. carjacking that did not result in the death of another person. He contends that the facts of his case could have convinced a jury to believe that he killed Ms. Tiesler and then in a separate and unrelated incident after the murder, stole her vehicle. This set of circumstances, he argues, would

---

[5] LeCroy also argues that there is no provision in the Federal Rules of Criminal Procedure authorizing a grand jury to make "special findings," as the grand jury did in this case. This circuit has recognized a grand jury's special findings in the past. See, United States v. Waldon, 363 F.3d 1103, 1108 (11th Cir. 2004). In addition, Federal Rule of Criminal Procedure 7, which deals with the grand jury, contains nothing to suggest that grand juries are prohibited from making such special findings. As noted above, the fact-finding responsibility of grand and petit juries is so well-embedded in our legal system that statutes rarely, if ever, expressly provide for such a jury finding. Thus we reject the defendant's argument that the absence of an express statutory provision authorizing grand jury special findings makes the indictment in this case defective.

14

make him guilty of "simple carjacking," but not the capital offense of carjacking where death results.

We disagree. The evidence in this case supported only two possible verdicts: (1) the aggravated carjacking resulting in the death verdict which was found by the jury and (2) an absolute acquittal. The carjacking statute requires, for any carjacking at all, a taking of a motor vehicle, with intent to cause serious bodily harm or injury, "from the person or presence of another by force and violence or by intimidation." 18 U.S.C. § 2119(3).[6] In this case, force, and not intimidation, is relevant. The only force exerted against, or in the presence of, another person was the assault, rape, and murder of Joann Tiesler. LeCroy's attempt to separate force against a person from the death simply does not fit the facts of this case. If, as LeCroy contends, there was no connection between the murder and the theft of the car, then he would have been entitled to an acquittal because Tiesler's Ford Explorer would not have been taken "from the person or presence of another by force and violence or intimidation." Put another way, both

---

[6] Section 2119 reads in relevant part: "Whoever, with the intent to cause death or serious bodily harm takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, or attempts to do so, shall–
    (1) be fined under this title or imprisoned not more than 15 years, or both,
    (2) if serious bodily injury (as defined in section 1365 of this title). . . results, be fined under this title or imprisoned not more than 25 years, or both, and
    (3) if death results, be fined under this title or imprisoned for any number of years up to life, or both, or sentenced to death.

15

simple carjacking and aggravated carjacking require the same nexus between the force and the taking of the car; even simple carjacking requires the taking of a motor vehicle (with the necessary intent) "from the person or presence of another by force."

The jury was presented with the only two verdicts that fit the facts and evidence in the case, and it concluded after reviewing the evidence that LeCroy was guilty of the capital offense. The district court did not err by refusing to give the requested lesser-included jury instruction.

## C. Sufficiency of the Evidence

LeCroy argues that there was insufficient evidence that the force exerted against Tiesler was employed in furtherance of the carjacking, and thus that the death did not result from the carjacking. In the same vein, defendant also argues that there was insufficient evidence for a jury to conclude that he had formed an intent to take the car before or at the time the force was exerted against Tiesler resulting in her death.

We review the sufficiency of the evidence presented at trial *de novo*. The evidence is viewed in the light most favorable to the government, with all inferences and credibility choices drawn in the government's favor. The question to ask is whether a reasonable jury could have concluded that the evidence

16

established the defendant's guilt beyond a reasonable doubt. United States v. Diaz, 248 F.3d 1065, 1085 (11th Cir. 2001).

In support of his contention, LeCroy cites United States v. Applewhaite, 195 F.3d 679 (3rd Cir. 1999). In Applewhaite, the defendants assaulted the victim, threw his body into the victim's truck, and drove away. They were convicted of carjacking but the convictions were reversed, with the Third Circuit holding:

> The reason the defendants assaulted Romero was not to transport his body in his own car. Rather, the force was used solely for the purpose of bludgeoning Romero. That was the object of the assault. It was not the means of stealing his car. After defendants accomplished their objective, they dragged Romero's unconscious body to his car, and drove away. However. . .unless the threatened or actual force is employed in furtherance of the taking of the car, there is no carjacking within the meaning of 18 U.S.C. § 2119. Accordingly, the defendants' conviction for carjacking can not stand.

Applewhaite, 196 F.3d at 686.

LeCroy seeks to apply the logic from Applewhaite to his own case, claiming that the theft of Tiesler's vehicle was removed in time, and thus was unrelated to the force which had previously been exerted against Tiesler, and claiming that there was insufficient evidence that LeCroy had formulated the intent to take Tiesler's car before or at the time the force was exerted against her.

We disagree. We conclude that there was ample evidence that LeCroy formulated the intent to steal the car prior to exerting the force against Tiesler, and

17

that the force was employed in furtherance of taking the car. We noted above the ample evidence that LeCroy was faced with taking an unwanted psychosexual evaluation or returning to prison, and that he was planning to escape his supervised probation and escape the country using his father-in-law's passport. Upon his arrest at the Canadian border, the police found his "need to acquire" list of items necessary for his escape. There was also evidence of his need for a car, because the only one that might have been available, a Jeep Cherokee belonging to his father-in-law, was not available (the father-in-law having taken the keys away with him that weekend). Finally, and crucially, the only item taken from Tiesler's house as part of his assault upon her was a set of the keys to Tiesler's Ford Explorer. We conclude that a reasonable jury could find that the force was exerted against Tiesler in order to obtain her keys and carjack the car. A reasonable jury could find that LeCroy entered the Tiesler home, lay in wait for her return, and assaulted and killed her to get her keys and steal her car.

The instant case is very similar to United States v. Kimble, 178 F.3d 1163 (11th Cir. 1999). There the defendants robbed a restaurant, demanded the manager's car keys at gunpoint, and then exited the restaurant and fled in the manager's vehicle. They were convicted of carjacking and armed robbery. They appealed their convictions, claiming insufficient evidence of the requisite *mens*

*rea*, and that taking the keys from a person who is not in the immediate vicinity of the vehicle does not constitute taking it from the "person or presence" of another as required by § 2119.  In Kimble, as in LeCroy's case, the victim's physical location and the exercise of force used to take the car were somewhat removed in time and space from the actual entry into the vehicle itself. In Kimble, however, this court held that the "degree of nearness" demonstrated by the evidence in that case was sufficient to sustain a conviction. Kimble, 178 F.3d at 1168.

The only difference between this case and Kimble is that LeCroy committed murder, rather than armed robbery.  This distinction is not relevant to this issue on appeal.  In both cases, at the moment the defendants got into the vehicles and left the crime scenes, the force used to take the car was, to some extent, in the past.  In both cases, however, the jury could find that the force was being exerted pursuant to an intent to steal the vehicle and in furtherance of the carjacking.  We so hold in this case.  See also, United States v. Diaz, 248 F.3d 1065, 1096 (11th Cir. 2001) ("To uphold the convictions [for carjacking], the Court must conclude that there was sufficient evidence for a rational jury to conclude beyond a reasonable doubt that . . . [the defendant] intended to seriously harm or kill the driver if necessary to steal the car."); United States v. Lumley, 135 F.3d 758 (11th Cir. 1998).

D. The 1991 Search of LeCroy's Vehicle.

19

LeCroy argues on appeal that when police stopped his vehicle in 1991 their search of his car violated his 4th Amendment rights, and the use at his carjacking trial of illegally discovered evidence found during the vehicle search warrants a new trial.[7]

Rulings on motions to suppress evidence constitute mixed questions of law and fact. United States v. Garcia, 890 F.2d 355, 358 (11th Cir. 1989). We will accept the district court's factual findings unless they are clearly erroneous, but we will review the court's application of the law to the facts of the case de novo. Id.

While LeCroy was a suspect in a string of residential burglaries, his vehicle was stopped for having bald tires, and he was eventually arrested for operating an unsafe vehicle. Police were therefore constitutionally permitted to make a contemporaneous search incident to the arrest, including a search of the passenger compartment of the car. New York v. Belton, 453 U.S. 454, 460, 101 S.Ct. 2860, 2864 (1981). The evidence in question was discovered during this permissible search incident to arrest, and the district court properly admitted this evidence. Accordingly, we reject LeCroy's appeals based on the search.[8]

---

[7] We note, initially, that it appears that the validity of the 1991 search was litigated in LeCroy's 1995 federal gun possession trial, and if so LeCroy probably would not be entitled to raise the validity of the search again in this appeal.

[8] In one paragraph of his reply brief, LeCroy appeared to raise the argument that even if the search of his vehicle was valid, the police violated his 4th Amendment rights when they retained the documents found in his car after the completion of his prosecution for burglary. Because it was not fairly presented in LeCroy's briefs, we decline to address the argument.

### E. Evidence from 1991 Investigations Used During LeCroy's Trial.

During the guilt phase of the trial, the government offered as evidence the notes found during the 1991 car stop and details from LeCroy's 1991 burglaries to prove absence of mistake–that LeCroy did not intend to merely rob Ms. Tiesler–as well as modus operandi and identity. The defense objected at trial but the evidence was admitted.  On appeal, LeCroy argues that admission of the evidence from 1991 was improper under Federal Rule of Evidence 404(b), claiming it was too remote in time to be relevant, and that any probative value was substantially outweighed by the prejudicial effect.  A district court's evidentiary rulings under Rule 404(b) are reviewed using an abuse of discretion standard.  United States v. Eirin, 778 F.2d 722, 731 (11th Cir. 1985).

Rule 404(b) has been applied in this circuit through a three-part test.  In order to admit evidence under Rule 404(b), the district court must determine that (1) the evidence in question is relevant to an issue other than the defendant's character, (2) the evidence is sufficient for a jury to find the defendant committed the extrinsic act, and (3) the evidence must meet all of the requirements of Rule 403, specifically that its probative value is not substantially outweighed by its undue prejudice. United States v. Miller, 959 F.2d 1535, 1538 (11th Cir. 1992) (citations and footnote omitted).  See also, United States v. Taylor, 17 F.3d 333,

21

338 (11th Cir. 1994).  Rule 404(b) allows the admission of past crimes or acts to prove motive, opportunity, intent, preparation, plan, knowledge, identify, or absence of mistake or accident.  United States v. Beechum, 582 F.2d 898 (5th Cir. 1978) (en banc).

At LeCroy's trial, the government used the notes and the details of prior crimes to illustrate LeCroy's intent on the night of the murder and to rebut the defense contention that LeCroy only meant to rob Joann Tiesler.  There was nothing particularly prejudicial about most of the evidence, and even if prejudice could be demonstrated, it did not substantially outweigh the probative value of the evidence.  The evidence appears to satisfy all three prongs of the Rule 404(b) requirements, and its admission does not violate Rule 403.

Nor was the evidence of prior crimes too remote to be used during LeCroy's carjacking trial.  This court has previously upheld the admission of Rule 404(b) evidence that occurred more than 15 years before the charged offense.  United States v. Lampley, 68 F.3d 1296, 1300 (11th Cir. 1995); United States v. Pollock, 926 F.2d 1044, 1048 (11th Cir. 1991). Moreover, in this case the significance of the ten year time period between the previous and instant crimes is diminished because LeCroy was incarcerated for most of that time, and because the instant crime was committed approximately six weeks after his release from

22

prison. Therefore, we discern no abuse of discretion in the district court's admission of the evidence in question.

## F. Police Testimony Regarding the Knife and Blood Pattern.

At trial, the government called Georgia Bureau of Investigation Agent Jeff Branyon, a crime scene specialist who collected evidence at Tiesler's home and in her car when LeCroy was arrested near the Canadian border. Branyon testified that a blood stain on the back of Tiesler's shirt appeared to have been made by someone wiping a bloody knife off on the shirt. The defense claims that (1) Branyon gave expert testimony without proper notice under Rule 16 of the Federal Rules of Criminal Procedure (2) the government purposefully failed to comply with Rule 16 requirements and (3) thus the testimony about the blood pattern should have been excluded.

Rule 701 of the Federal Rules of Evidence permits opinion testimony by lay witnesses. To qualify, a witness' opinion is limited "to those opinions and inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed.R.Evid. 701. It is clear that Agent Branyon's testimony qualified under Rule 701 and did not constitute expert

23

opinion under Rule 702. Just because Agent Branyon's position and experience *could* have qualified him for expert witness status does not mean that any testimony he gives at trial is considered "expert testimony." In this case, Branyon made layperson observations about the shirt and knife, and therefore he did not provide expert testimony under Rule 702. Thus, no Rule 16 notice was required with respect to Branyon's testimony, and LeCroy has failed to demonstrate other reversible error with respect to that testimony.

## G. The District Court's Expert Witness Rulings.

In preparation for the sentencing phase, the defense notified the district court that it sought to introduce mitigating evidence in the form of a "teaching expert," a psychologist specializing in the study of men who suffered sexual abuse as children. In order to prepare rebuttal evidence, the government asked to have LeCroy undergo an inpatient psychiatric evaluation. A magistrate ordered the evaluation, but LeCroy refused, invoking his Fifth and Sixth Amendment rights.

The district court reserved making a final ruling on whether the teaching expert could testify, but allowed the government to have an expert prepare a report on LeCroy's mental condition that was to be sealed until the completion of the guilt phase of the trial. This report was to be based on documentation and LeCroy's medical files, not on a psychiatric evaluation. The district court decided

that if LeCroy were found guilty, the defense could inspect the report and decide whether to call its expert, but that the court would then decide whether a government expert would be able to testify in rebuttal, and which portions of the sealed report could be used.

LeCroy was convicted, but rather than calling a teaching expert at sentencing, the defense called two doctors who had treated LeCroy for psychological issues while he was incarcerated in the 1990s. The doctors were permitted to testify to certain information relating to their mental health treatment of LeCroy. However, when the defense sought to have the doctors present their opinion diagnosing LeCroy, the government objected. The district court ruled that if the doctor testified about personality tests and diagnoses, as proffered, the government might be able to present rebuttal evidence, including portions of the sealed report. As in the case of the prior ruling, the district court reserved ruling on the scope of the government's rebuttal evidence that the court would allow. In the end, the defense decided against introducing the challenged evidence.

Relying upon Luce v. United States, 469 U.S. 38, 105 S.Ct. 460 (1984), the government argues that the district court's rulings are not reviewable. In that case, the Supreme Court held that a district court's *in limine* ruling, permitting prior conviction evidence under Rule 609(a)(1) of the Federal Rules of Evidence, was

not reviewable because the defendant did not testify and the government never introduced the prior convictions at trial. Id. at 41-42, 105 S.Ct. at 463. The Court concluded that the alleged harm flowing from the district court's evidentiary ruling was "wholly speculative" because it would have been a "matter of conjecture" whether the district judge would have permitted the prior conviction testimony. Id.

This court applied Luce in United States v. Strudnicka, 777 F.2d 652 (11th Cir. 1985). There, the defendant was facing charges of bail-jumping and lying to acquire firearms. The trial court ruled that if the defendant chose to take the stand in his own defense, he could face questions about an earlier charge of failure to appear in court. Instead of being subjected to this questioning, the defendant declined to take the stand. He was convicted and later appealed, arguing that the trial judge erred in ruling those topics were permissible during cross examination. In that case, citing Luce, we held that Strudnicka's claim was barred: "The tactical decision not to take the stand, however, precludes appellant from challenging on appeal the trial court's ruling. A defendant must testify in order to raise and preserve this issue for appellate review." Id. at 660.

By not calling his expert witnesses, LeCroy faces the same problem discussed in Luce. Without a ruling from the district court on the scope of the

26

government's rebuttal evidence, LeCroy's argument that the government's rebuttal would have been "overkill" is wholly speculative. The defense attempts to distinguish Luce because it involved an *in limine* motion on prior convictions, while the case at bar was about expert mitigation evidence and the district court's ruling was not *in limine*. These factual distinctions do not make the holding in Luce any less applicable to this case.

The Luce rationale applies in this case, just as it did in Strudnicka. LeCroy simply did not create the conflict necessary for the issue to be appealable. The defendant could have called his witnesses, had them testify, and then objected at the proper time to government rebuttal testimony that he felt was "overkill." In such case, we would have had a concrete ruling by the district court as to the scope of the rebuttal. By not calling the witnesses, however, he would force this court to speculate twice: once with regard to the content of the defense experts' testimony, and a second time about what the district court would have permitted from the government expert in rebuttal. It would be improper for this court to engage in such speculation, and thus we decline to reach the merits of this issue.

H. Evidence of Prior Crimes and Bad Acts to Prove Future Dangerousness.

In compliance with the FDPA, the government served notice on LeCroy of

27

its intent to seek the death penalty.[9]  In its section 3593 notice, the government

listed statutory aggravating factors, as required by the FDPA, in order to justify a

sentence of death upon conviction.[10]  It also indicated it would rely on some

nonstatutory aggravating factors, including the defendant's future dangerousness.

Specifically, the government gave notice of two applicable statutory aggravating

factors: that LeCroy committed the murder in an especially "[h]einous, cruel, and

depraved manner" involving "torture and serious physical abuse" to Ms. Tiesler,

and that the murder involved "substantial planning and premeditation." In

addition, the government gave notice of two nonstatutory aggravators upon which

it would rely: future dangerousness and victim impact.  LeCroy's focus in this

---

[9]     Section 3593 reads in relevant part:

(a) **Notice by the government**.--If, in a case involving an offense described in section 3591 the attorney for the government believes that the circumstances of the offense are such that a sentence of death is justified under this chapter, the attorney shall, a reasonable time before the trial or before acceptance by the court of a plea of guilty, sign and file with the court, and serve on the defendant, a notice--

(1) stating that the government believes that the circumstances of the offense are such that, if the defendant is convicted, a sentence of death is justified under this chapter and that the government will seek the sentence of death; and

(2) setting forth the aggravating factor or factors that the government, if the defendant is convicted, proposes to prove as justifying a sentence of death.

---

[10]     The statutory factors were (1) that the defendant committed the crime in an especially heinous or cruel manner involving torture or physical abuse of the victim (2) the defendant committed the offense with the expectation of receiving something of pecuniary value and (3) the defendant committed the offense after substantial planning and premeditation.  The government eventually dropped the "pecuniary value" factor prior to trial.

28

appeal is on the future dangerousness. In that regard the notice provided that LeCroy represented a "continuing danger to the lives and safety" of others, and that the defendant has committed the instant crimes and also "has committed and exhibited acts and characteristics including, but not limited to, the following: (a) specific threats of violence; (b) risk of escape; (c) low rehabilitative potential."

To prove the future dangerousness factor, the government called four witnesses at trial who testified about LeCroy's prior crimes and bad acts, including burglary, statutory rape, and the "hit list" that he had created. LeCroy now argues that the district court should have excluded this evidence because (1) it was not included as an aggravating factor in the notice of intent to seek the death penalty and (2) it was not relevant to any aggravating circumstance included in the notice to seek the death penalty.

With respect to LeCroy's first argument, it is clear in this case that the government's section 3593 notice sufficiently apprised LeCroy of all the aggravating factors relied upon by the government, statutory and nonstatutory. The gist of LeCroy's argument is that there is an obligation to provide notice not only of the aggravating factor, but also of the evidence supporting same. We have expressly rejected an identical argument in United States v. Battle, 173 F.3d 1343, 1347 (11ᵗʰ Cir. 1999). There we held that "[t]he Government is not required to

provide specific evidence in its [§ 3593] notice of intent." Id. at 1347. Moreover, the Supreme Court held in Gray v. Netherland, 518 U.S. 152, 166-70, 116 S.Ct. 2074, 2083, that, although there is a right to advance notice of the charges, there is no extant constitutional right to advance notice of the evidence to prove such charges in a capital sentencing hearing. Id. at 167-68, 116 S.Ct. at 2083. The Court indicated that the import of the cases was strongly against the validity of any such right. Id. at 168, 116 S.Ct. at 2084.

The government in this case satisfied its constitutional and statutory obligations by informing the defendant of what aggravating factors–both statutory and nonstatutory–it intended to prove at trial. The government was not obligated to outline what specific pieces of evidence it planned to use to support the aggravating factors. We hold that the government's Notice of Intent to Seek the Death Penalty was sufficient.

LeCroy also claims that the evidence used to prove future dangerousness during the sentencing phase was irrelevant and should have been excluded by the trial judge. LeCroy's prior crimes–burglary and statutory rape–were clearly probative of the question of whether he posed a future threat. The "hit list" police discovered in 1991 was especially relevant to this issue; LeCroy's intended targets included the mother of his statutory rape victim, law enforcement personnel, and

30

"anyone who [stood] between [LeCroy] and freedom or escape." We hold LeCroy's relevance argument is without merit, and find that the district court did not abuse its discretion when it admitted evidence of LeCroy's prior crimes and bad acts.

## I. The District Court's Jury Instruction on Future Dangerousness.

LeCroy argues that the district court committed error when it gave instructions to the jury that allowed the members to consider LeCroy's potential danger to the general public in determining whether the aggravating factor of future dangerousness had been proven. At the charge conference, LeCroy objected to the proposed jury instruction, arguing that the jury's consideration of his future dangerousness should be limited to the context of prison life, and should not include any consideration of a threat posed to the public at large. However, the government argued that LeCroy also presented a genuine risk to the public outside of prison, noting that it planned to present evidence of LeCroy's attempts to escape while he was incarcerated in Minnesota, and while he was awaiting trial. The judge indicated at the charge conference that he would take the defendant's objection under consideration.

In response to defendant's objection, the district judge revised the proposed

instruction and charged the jury that it could consider any threat to the general public only if the jury first found beyond reasonable doubt that defendant was an escape risk. There was no further objection by the defendant. Now, on appeal, LeCroy argues for the first time that a different standard should have been used. He now argues that the district court erred in conditioning the jury's consideration of dangerousness to the public on a mere risk of escape, as opposed to a likelihood of escape.

Although a challenge to a jury instruction is ordinarily a question of law that is reviewed *de novo*, United States v. Richardson, 233 F.3d 1285, 1292 (11th Cir. 2000), because there was no objection in the district court on this ground, our review is pursuant to the plain error analysis. Under plan error review, an appellate court must not correct an error the defendant failed to raise in the district court unless there is: (1) error, (2) that is plain, and (3) that affects substantial rights. If all three of those conditions are met, the court may exercise its discretion to notice a forfeited error but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir. 2005).

We readily conclude that there is no plain error. The error, if any, is not plain or obvious, there being no relevant case law. Moreover, we readily conclude

32

that LeCroy cannot satisfy the third prong; he cannot demonstrate that there is a reasonable probability of a different outcome. In light of LeCroy's history of attempted escapes and the judge's clear instructions to the jury requiring that it find a risk of escape "beyond a reasonable doubt," we cannot conclude that there is a reasonable probability that the different standard urged by LeCroy would have resulted in a different outcome. Moreover, the jury found every other aggravating factor alleged by the government, and such findings are amply supported in the record.

## III. CONCLUSION

Having addressed each of LeCroy's grounds for appeal and finding no reversible error, we AFFIRM his conviction and sentence of death.

**AFFIRMED**.